## O'DONNELL et al. v. UNITED STATES.
### No. 7522.

Circuit Court of Appeals, Ninth Circuit.
Oct. 22, 1936.

As Amended on Denial of Rehearing
June 7, 1937.

James E. Kelby, Gordon Lawson, and Samuel M. Garroway, all of Los Angeles, Cal. (Robert N. Denham, of Washington, D. C., of counsel), for appellants.

Warren Olney, Jr., and Robert L. Lipman, both of San Francisco, Cal., for appellants on rehearing.

H. H. McPike, U. S. Atty., and Esther B. Phillips and Robert B. McMillan, Asst. U. S. Attys., all of San Francisco, Cal. (Philip Buettner, Department of the Navy, of Washington, D. C., of counsel), for the United States.

Before DENMAN, MATHEWS, and HANEY, Circuit Judges.

DENMAN, Circuit Judge.

This case began in a bill filed by the United States for the cancellation of two patents granting certain swamp and overflowed lands in the State of California to that state, the patent from that state to one Darlington, and the successor deeds thereto, and for the quieting of the title of the United States against the successors in interest to California in the patented lands. The lands are a part of Mare Island, northwesterly of the main plant of the Mare Island Navy Yard. The District Court held for the United States, and this appeal followed.

Preceding the reasoning and extended consideration of the authorities of this opinion is a brief chronological statement of the facts and successive issues presented and our holding in each.

The United States asserts it has deraigned title from one Castro, claimed grantee from the Mexican government. Also, if the Castro title is not valid, it claims title by virtue of reservations of the land for naval purposes, made after the lands were ceded to the United States by the Treaty of Guadalupe Hidalgo (9 Stat. 922). Appellants, deraigning title from the State of California, claim Castro had no title and that the lands were granted by Congress to California prior to the attempted naval reservations.

The government asserts that the evidence shows that in 1840 one Jose Victor Castro, a Mexican citizen, petitioned the then Governor of California, one Alvarado, for a grant of Mare Island, including the swamp and overflowed lands here in controversy. The acting Governor Jimeno gave Castro a provisional permit to occupy Mare Island, and on May 2, 1841, Governor Alvarado executed an instrument purporting to grant to Castro Mare Island, including the land in question. No evidence of the recordation or filing of the grant in the archives of the Mexican government was offered.

We hold this evidence not available to the government because in the proceeding before the Board of Land Commissioners, hereafter discussed, in which the evidence was produced, the United States violated a trust relationship to the State of California with reference to these lands, or, alternatively, because California was a third person alien to the proceeding in which the evidence appears, and because the action there was nonadversary and presented no justiciable issue, all of which contentions are more fully considered hereafter.

We hold further under Berreyesa v. U. S., 154 U.S. 623, 14 S.Ct. 1179, 23 L.Ed. 913, and other cases later cited, that, even were these facts proved, they show no title in Castro because of the lack of filing or recordation of the grant in the Mexican archives.

On July 4, 1848, California was ceded to the United States by the Treaty of Guadalupe Hidalgo. We hold this treaty transferred the lands in dispute to the United States.

On September 28, 1850, by an act of Congress, 9 Stats. 519 (see 43 U.S.C.A. §§ 982–984), the United States granted to California whatever title it had to the swamp and overflowed lands here in question.[1]

[1] "That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby, *granted* to said State. [Italics supplied.]

"Sec. 2. *And be it further enacted,* That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the governor of the State of Arkansas, and, at the request of said governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State of Arkansas, subject to the disposal of the legislature thereof: *Provided, however,* That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as

The brief of the United States concedes "that the lands in controversy were swamp and overflowed in physical character and would have been swamp and overflowed lands under the Act of September 28, 1850," if they were public lands of the United States on that date.

The patents sought to be canceled are for a part of these swamp and overflowed lands so granted to California. In this proceeding the patents establish the status of California and its successors in interest as present owners of the legal title. They further establish that California, was granted, in præsenti, in 1850, the full equitable interest by the congressional act of that year, the United States reserving the bare legal title. *This status, established by the patents, is the given quantity* in the legal problem here involved. To overcome it, the government has upon it the extraordinary burden of proof necessary to defeat the title and rights established by such a solemn instrument.

On November 6, 1850, 5 weeks after the grant to California, President Fillmore made an attempt, formally perfect, to reserve Mare Island, including the swamp and overflowed lands, "from sale." On February 11, 1853, he again made an attempt, formally perfect, to make of Mare Island and these swamp and overflowed lands a "reservation of public lands" authorized under an Act of Congress of August 31, 1852 (section 3 [10 Stat. 104]).

We hold that, because of the prior grant to that state, neither reservation was effective to divest California's then full equitable interest in the lands in dispute.

On March 3, 1851 (9 Stats. 631, c. 41), Congress created a commission of three commissioners "for the purpose of ascertaining and settling private land claims in the State of California." Section 1. This act provided that any one claiming title to lands in California derived from a Spanish or Mexican grant must within 2 years present his claim to the commission which must render a decision on the validity of the claim. Section 9 provided for a review of such decision by the District Court, and section 10 provided for an appeal to the Supreme Court. With respect to all lands, the claims to which were not presented to the commission within the 2-year period, such lands were to be considered as a part of the public domain.

Section 15 provided that the final *decrees* rendered, or any patent issued, under the act "shall be conclusive *between the United States and the said claimants only, and shall not affect the interests of third persons.*" (Italics supplied.)

The act provided for service by the claimant on the United States and for its defense against the validity of the claimed Mexican titles. If there were such a defense, it was the duty of the United States attorney to seek a "final decree" in its favor which "shall be conclusive between the United States and the said claimants."

On August 31, 1852, the Castro claim was presented to the Land Commission by Bissell and Aspinwall, to whom it had come by mesne conveyances.

On January 4, 1853, the United States purchased the interest of the claimants Bissell and Aspinwall in the Castro claim to Mare Island, thereby merging in the United States the interests of both parties to the controversy. The deed declared the purpose of the purchase to be to carry out the provisions of an act of Congress to devote the property to the use of a United States navy yard.

We hold that by this transaction the United States sought to acquire the Castro title for its own use, and adverse to the use and interest of the State of California, its cestui que trust.

On October 10, 1854, and *after* it had acquired whatever title Castro had, the United States for the *first* time appeared in the Land Commission proceeding in the taking of a deposition. Without advising the Commission of its personal proprietary interest in the Castro title, it proceeded to conduct a pretended controversy with Bis-

---

far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid,

"Sec. 3. *And be it further enacted,* That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is 'wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

"Sec. 4. *And be it further enacted,* That the provisions of this act be extended to, and their benefits be conferred upon, each of the *other States of the union in which such swamp and overflowed lands, known as designated as aforesaid, may be situated.*" (Italics supplied.) 9 Stat. 519.

sell and Aspinwall. Further depositions were taken and witnesses examined by both parties in this sham proceeding.

The United States contends that California was not a "third person" alien to this controversy within the meaning of the statute creating the commission, but contends that California and appellants here "are remote claimants under, successors to, and in privity with, the United States of America," and hence the decree in favor of the Castro title is a decree also against California and appellants, and they "are bound by said decree." This although at all times after its appearance it was to the proprietary interest of the United States to establish that the Mexican government granted the lands in controversy to Castro and therefore that they were not ceded to the United States by the Treaty of Guadalupe Hidalgo.

Such action of the United States was at all times adverse to California, its cestui que trust to which, in the absence of a grant to Castro, the lands were granted by the United States in 1850.

On May 8, 1855, the Land Commission gave its decree against the United States, and confirming to Bissell and Aspinwall the Castro title, which they no longer owned.

On February 18, 1856, the United States filed its petition for review in the District Court, where, under the act, it was entitled to a trial de novo. The petition alleged that the Castro "claim is invalid." On the same day, Bissell and Aspinwall, who over three years before had transferred the title to the United States, appeared and answered the petition, alleging "Their" title "to Mare Island" "Is a good and valid title" and praying an affirmance of the decree of the Land Commission.

Of date March 2, 1857, a decree affirming the decision of the Land Board, prepared for the judge, appears in the record. It was never signed. The case rested in this condition for 73 years. Appellants suggest that the reasons for this long non-action by the United States were the opinions of Attorney General Caleb Cushing, of date April 9 and October 12, 1853, later considered. These opinions were given after the United States had acquired the Castro claim, but before any testimony was taken before the Land Board. They declare that a pretended defense against the Castro claim "probably could not affect any adverse claimant" and that California "may set up, and probably maintain, title as against the United States, as to so much of Mare Island" as constitutes "uncultivatible overswamped land within its limits."

On March 18, 1857, about a fortnight after the date of the unsigned decree, the State of California gave to one David Darlington its patent to the Mare Island swamp and overflowed lands, identified as those in Survey No. 34, the lands in dispute. In the present suit the United States seeks also the cancellation of the Darlington patent from California, and of all intervening conveyances to and including those to appellants.

From March 18, 1857, Darlington and his successors in interest have persistently and in good faith maintained that they have held all the title to these lands which was granted to California in 1850.

Some time prior to March 6, 1928, a mandamus proceeding was brought on the relation of appellant O'Donnell against Hubert Work, then Secretary of the Interior, in the Supreme Court of the District of Columbia, to compel the Secretary to issue the patent of the United States to appellant O'Donnell and others for the lands in Survey No. 34. Proceedings therein were duly had and a peremptory writ issued to the Secretary to issue the patent. Appeal was taken to the Court of Appeals of the District of Columbia where the issue of the writ was affirmed. Work v. U. S. ex rel. O'Donnell, 57 App.D.C. 309, 23 F.(2d) 136. Certiorari was not sought by the Secretary.

We hold that as to the decision against the Secretary it is res judicata as to the character of the lands in question as swamp and overflowed lands to which California, if it had been granted them by the act of 1850, was entitled to patent by virtue of this identification by Survey No. 34 filed with the Secretary.

On April 15, 1930, in the District Court, the case of U. S. v. Bissell and Aspinwall was reopened, and a decree nunc pro tunc of March 2, 1857, was ordered in favor of Bissell and Aspinwall. The decree recites both the acquisition of their title by the United States and that the order directing a decree establishing the Castro title was "by consent of the United States District Attorney."

Neither the State of California, then holding the United States patent, nor any

of its successors in interest appeared or were made parties to this action, and no notice of any kind given them. So far as California and its successors are cestuis que trust of the United States, the decree of April 15, 1930, was secretly obtained. Nevertheless the decree purports to be binding upon them, holding: "* * * That all the right, title and interest of the Appellees herein in and to the said claim, have passed to and have been acquired by the United States, the Appellant herein, by purchase from the said Appellees, and that all persons [California and its successors] *claiming by, under, or through the Appellants* [the United States] or the Appellees or any of them, are *chargeable with notice of this action* and of everything that has been done therein, and therefore, *that no rights of third persons have intervened or could intervene."* (Italics supplied.)

We hold that California and appellants are not bound by the decree or anything done in the Bissell and Aspinwall case, whether they be regarded as cestuis que trust, claiming, as asserted in the decree, under the United States, which thus sought and procured a decision adverse to their interest, or as "third persons" alien to the litigation within the meaning of the act creating the Land Commission.

We further hold, sitting in this equitable proceeding, that, as in any such case, appellants may show by any evidence, whether within or dehors the Bissell and Aspinwall record, the adverse interest of the United States, as trustee to that of its cestuis, California and appellants. They may thereby defeat the United States' assertion that, because they hold their equitable interest by grant of the United States they are bound by the decree, by showing that such a contention cannot be maintained with clean hands. Michaels v. Post, 21 Wall. 398, 426, 22 L.Ed. 520.

We also hold that the decree is not binding upon appellants because it was given in a nonadversary action in which the claimant and defendant were one, and hence no justiciable issue existed upon which adjudication could be had.

The United States also contends, though not pressing it with vigor, that by the Treaty of Guadalupe Hidalgo there was a withdrawal of the swamp and overflowed lands in question because of the pendency of the invalid Castro claim. Such a withdrawal would remove the claimed area from the "public lands" category, and hence it would not pass to California by virtue of the grant of 1850.

We hold there was no such withdrawal.

■■ I. The patents to California determine the satisfaction by the patentee of the requirements of the granting act of 1850 as to identifying the land by surveys as swamp and overflowed land, of which the United States conveyed whatever title it had in 1850.

The patents sought to be declared void were given by the Secretary of the Interior to California under the compulsion of a mandate in a proceeding brought by the successors to the state title in the Supreme Court of the District of Columbia, in which litigation the Court of Appeals finally determined that the writ should issue. Work v. U. S. ex rel. O'Donnell, 57 App.D.C. 309, 23 F.(2d) 136.

The authorities we discuss infra show that the above admission of the United States as to the swamp and overflowed character of the lands described in the patent is an admission that the act of 1850 granted to California at least a full equitable and indefeasible interest in whatever property the United States then had in them. We take it that the United States is not seeking to cancel the patents because of a mere failure of the Secretary in some ministerial duty regarding the approval of one or another survey in his files; that is to say, invoking this court, sitting in equity, to avoid temporarily what ultimately must be done.

The compulsion of the mandate in the proceeding against the Secretary of the Interior required him merely to exercise his ministerial discretion. It did not prescribe the method of its exercise. In response to the writ he exercised it with reference to a survey in his files, called Survey No. 34, upon which the descriptions in the patent are based. His return shows the exercise of that discretion on January 10, 1925, in the following language: "From the evidence before me I am led to the conclusion that the body or strip of land known as Survey No. 34, was, at the date of the swamp-land grant of September 28, 1850, swamp in character, * * * Accordingly, it is hereby declared to be swamp land, and, as such, subject to patent to the State of California in the absence of other sufficient reasons." Plaintiff's Exhibit J, p. 45. Work v. U. S., 57 App.D.C. 309, 23 F.(2d) 136.

Upon this approval of Survey No. 34, so evidenced in the Secretary's return, the writ of mandate was issued for the execution of the assailed patents. The Secretary's determination with regard to the survey and character of the land is conclusive and may not be collaterally attacked. Cragin v. Powell, 128 U.S. 691, 699, 9 S.Ct. 203, 32 L.Ed. 566; Knight v. United Land Ass'n, 142 U.S. 161, 176, 12 S.Ct. 258, 35 L.Ed. 974; Rogers Locomotive Works v. Emigrant Co., 164 U.S. 559, 571, 17 S.Ct. 188, 41 L.Ed. 552; Gauthier v. Morrison, 232 U.S. 452, 460, 34 S.Ct. 384, 58 L.Ed. 680.

The patent reverts back to the date of the grant of 1850, and conveys as of that date, whatever *legal* title it then had, thus completing in law whatever had been granted in equity. French v. Fyan, 93 U.S. 169, 170, 23 L.Ed. 812, considered infra.

The United States nevertheless is entitled to seek to cancel the patent on grounds that it had no title to the lands, or that before the patentee's interest had become vested, in equity or at law, the lands had been reserved to a public use. United States ex rel. McBride v. Schurz, 102 U.S. 378, 396, 404, 26 L.Ed. 167.

II. The heavy burden of proof on the United States in seeking to cancel its patents.

In seeking to have declared void a patent from the United States, which by reverting to September 28, 1850, evidences a then grant of full legal title to the lands, the United States has a more than ordinary burden of proof. To avoid such "solemn evidences of title emanating from the government of the United States under its official seal" requires the observance of the rule that it "cannot be done upon a bare preponderance of evidence which leaves the issue in doubt" even more than in suits between private parties for such cancellations. Only "that class of evidence which *commands respect,* and that amount of it which *produces conviction,* shall make such an attempt successful." United States v. Maxwell Land-Grant Co., 121 U.S. 325, 381, 382, 7 S.Ct. 1015, 1029, 30 L.Ed. 949. This language was quoted and reaffirmed in United States v. Stinson, 197 U.S. 200, 204, 205, 25 S.Ct. 426, 49 L. Ed. 724. Also in Wright-Blodgett Co. v. U. S., 236 U.S. 397, 402, 403, 35 S.Ct. 339, 59 L.Ed. 637.

As stated, the patent, until overcome by such evidence, establishes the fee to the land in the appellants. As later shown, it also establishes the status of California as the cestui que trust of the United States, holding the full equitable title by virtue of the congressional grant of 1850; the United States, as trustee, holding the bare legal title. This is the given quantity, to displace which this heavy burden rests on the United States.

We will now consider the claim of the United States that it has shown the validity of the Castro title by evidence in the instant case, as distinguished from its claim, later considered, that its validity is established by the decree in the Bissell and Aspinwall case.

III. Assuming that the Castro title could be established against the patents by new evidence in the instant case, commenced more than 65 years after the expiration of the time to file claims before the Land Board, its validity is not sustained here, because

(a) The paper writing purporting to be a certified copy of a writing in Spanish, in words of a Mexican grant to Castro, recorded in a county other than that of the location of the land, with no showing of execution of an original, and without acknowledgment, is not admissible under the California law, even though unsuccessful search for an original has been proved;

(b) Even if execution of some grant to Castro had been shown and the alleged copy offered in the course of proving the contents of an ancient document, it was not admissible because no proper search for the original was made. Herein of the decision in the Bouldin v. Phelps case ([C.C.] 30 F. 547) that the Castro grant was fraudulent and void certain ethical considerations relative to the conduct of the United States here seeking equity;

(c) Even if the execution by the Mexican government of a document in words of a grant to Castro had been shown, he did not acquire title, because the duplicate was not shown to have been filed in the Mexican archives;

(d) There is no evidence of even a possessory right in or possession by Castro.

Underlying all the government's several attacks on the patents to California is its claim that one Castro, in 1841, was granted the swamp and overflowed lands by the Mexican government, which lands

the United States acquired by mesne conveyance in 1853.; that is, after the grant to California in 1850. If this contention be correct, the United States did not acquire these lands from Mexico in the cession of area now constituting the State of California, and hence they were not granted to California by the act of 1850.

■ (a) The paper writing purporting to be a certified copy of a writing in Spanish, in words of a Mexican grant to Castro, recorded in a county other than that of the location of the land, with no showing of execution of an original, and without acknowledgment, is not admissible under the California law, even though unsuccessful search for an original has been proved.

Aside from the record in Bissell and Aspinwall v. United States, which we hold, infra, cannot be considered against the California title, there is nothing in the transcript of the record of the trial below relating to a grant by the Mexican authorities of the lands here in question, to which the United States claimed to have deraigned title, but a copy of an unacknowledged, unsealed, and uncertified document in Spanish, shown only to have been copied in July 28, 1852, in the Book of Deeds in the office of the recorder of Sonoma county, Cal. The bill alleges, and it is admitted, that Mare Island is in the county of Solano, not Sonoma, the place of the claimed recordation. Nor was it in Sonoma county on July 28, 1852.

By the Act of May 3, 1852 (Cal.Stats. 1852, p. 236), the boundaries of Sonoma county were so changed as to exclude Mare Island from that county. This act under the California Constitution as it then stood went into effect on the date of its approval, that is, May 3, 1852, over two months before the recordation. People v. Clark (1851) 1 Cal. 406.

That a certified copy of a document which is recorded in a county other than that where the land lies is not admissible under the statutes permitting the introduction of a copy of recorded instruments, is established by all the authorities. It will suffice to refer to Virginia & West Virginia Coal Co. v. Charles (D.C.1917) 251 F. 83, 102; 22 C.J. p. 883, § 967, and cases there cited.

The translation of the document shows the words of a grant from a former Governor, one Alvarado, to one Victor Castro. It purported to have been dated May 2, 1841. No original document was offered by the government.

Appellants below moved to strike it from the record, on the ground that such a document had no evidentiary value, citing Wilson v. Corbier, 13 Cal. 166. No contrary authority has been cited by the government, and in brief and argument it offers no opposition to the contention.

The holding of the California Supreme Court that such a document acquires no evidentiary value under California's provisions for recordation (Cal.Stats.1851, p. 199), and that it is not admissible as evidence of title, is clear. The report states the issue as follows: "Ejectment for a tract of land, being a part of the Jimeno Grant, in Colusa County. Plaintiff, in deraigning title from Jimeno, offered and read in evidence a copy of the grant, with translation attached. Next, he offered a book from the Recorder's office of Colusa County, and asked to read therefrom, what purported to be a copy, *in the Spanish language,* of a deed from Jimeno to Larkin and Missroon, executed in 1847. To the introduction of which defendants objected, on various grounds, but mainly that the deed, as recorded in said book, purported to be a copy; that there was no proof of the execution of an original, and that the *original did not appear to have been properly acknowledged, or proved and certified.* Plaintiff then proved that he had made search for the original deed, without success. The Court ruled out the deed, and plaintiff excepted." (Italics supplied.) Wilson v. Corbier, supra, 13 Cal. 166.

The court held as follows: "The plaintiff failed to deraign title. The deed from Jimeno to Larkin and Missroon was not proven. The deed was executed in 1847, and made a record in the office of Colton, Alcalde of Monterey. A copy in the Spanish language appears to be on the records of Colusa County. But we know no law which authorized the Recorder or Clerk of Colusa to record this copy so as to make it evidence, without further proof." Wilson v. Corbier, supra, 13 Cal. 166, 167.

■ The document should have been excluded, for even had there been a proper search, the copy was not admissible under the California law which controls the admission of evidence in suits in the Federal courts involving title to California lands.

In Olcott v. Bynum (1872) 17 Wall. (84 U.S.) 44, 21 L.Ed. 570, the matter under

consideration was a land title in North Carolina, and the question was as to the admissibility in evidence of a certified copy of a deed improperly recorded. As to this question the Supreme Court said: "It is one to be determined by the lex loci rei sitæ. It is to be considered solely in the light of the statutes and adjudications of North Carolina. This court must hold and administer the law upon the subject as if it were sitting as a local court of that State." Olcott v. Bynum, supra, 17 Wall. 44, 57, 21 L.Ed. 570.

█ This, of course, is nothing more than a particular application of the general rule that in matters pertaining to real property the law of the situs governs.

█ In view of our holding, infra, that the record in Bissell and Aspinwall v. United States is not competent evidence against appellants deraigning the California title, the record here is bare of any evidence that prior to the Treaty of Guadalupe Hidalgo, Mexico ever did anything to divest itself of its title to the lands in question. They therefore became public lands of the United States upon the cession to the United States by that Treaty.

(b) **Even if execution of some grant to Castro had been shown and the alleged copy offered in the course of proving the contents of an ancient document, it was not admissible because no proper search for the original was made. Herein of the decision in Bouldin v. Phelps that the Castro grant was fraudulent and void and certain pertinent ethical considerations relative to the conduct of the United States here seeking equity.**

It should be noted, in this equitable proceeding, that the Castro deed became an ancient document because of the passage of time during the government's delay of seventy-seven years in prosecuting its unified nonadversary claimant-defendant appeal in the District Court. That is from 1857 to 1930, when, after over sixty years' delay before the Interior Department, and, finally, by pressure of mandate from the District Court of the District of Columbia, the United States, in 1928, was compelled to recognize the 1855 Survey No. 34 and grant its patent for the lands so surveyed, and then, for use in canceling its patent, caused the nunc pro tunc decree to be entered in the case in the California District Court. This should be considered in connection with the further claim of the government that by delaying for seventy-three years in taking its decree, really in favor of itself, it kept Mare Island *subjudice* and hence not subject to patent, while it retained its use for its Navy Yard. Also it warrants its consideration in connection with the contention, considered infra, that the United States, as trustee, can conduct a proceeding against a faked opponent, though really against itself, and then claim the benefit of the judgment as adverse to its cestui.

We pass these considerations for the purpose of fully exploring the government's claims.

█ Assuming that there had been proof of the execution of some kind of document to Castro, and that the claimed anciency of the copy of the writing in Spanish is available to prove the contents of an original grant, all the authorities are agreed that a thorough search for the original must be made. No such search was proved to have been made by the government in this case.

█ In this connection it must be remembered that under the Mexican law there are two documents containing the words of a grant of land from that government. One is the original, held by the grantee, and the other is the copy which must be deposited in the Mexican archives. The document sought to be proved is the claimed original, once in the possession of Castro, as grantee. Proper search for this document would require, first, inquiry of Castro himself, who is not shown not to be alive; if, as is likely, he is dead, then of his representatives and heirs; failing there, search among those to whom the document might have passed as a muniment of title, including Bissell and Aspinwall, and their heirs, or the successors to their papers and documents; and, finally, in the archives of the United States itself, the claimant seeking to avail itself of this title against its cestui. There is no evidence of any such search.

There is evidence of a search, more than sixty-five years after the appeal of the Bissell and Aspinwall suit to the District Court. This search was of the Mexican archives and of the records of the Land Commission in the office of the Surveyor General for California, who, it is claimed, became their successor custodian. With regard to the search of the Mexican archives, it is obvious that this is meaningless so far as concerns the original document, if any, given to Castro. That docu-

ment has no reason to be in the Mexican archives.

■ So far as concerns the records of the Land Commission, we hold, infra, that the United States cannot avail itself of the transcripts of the evidence taken adverse to California in the Bissell and Aspinwall proceeding. There is, therefore, no evidence that the claimed lost document ever came into the possession of the Land Commission or became a part of its records. There is, therefore, no relevancy to evidence of a search of those records.

However, it appears that the government was charged with knowledge of the record in Bouldin v. Phelps (C.C.1887) 30 F. 547, in which the same court from which comes this appeal found that the claimed original Castro grant was given to it in evidence and was there held to be a fraudulent document, actually executed *after* Governor Alvarado had ceased to be Governor and *after* California had ceased to be Mexican territory.

■ In this proceeding in equity the District Court in the trial below should have had called to its attention the record in Bouldin v. Phelps, supra, which shows the existence of a controversy over the same document that is here relied on, *and the presence of that document in THAT record in 1887,* some *thirty* years after the hearing before the Land Commission, concerning the title in question here. The record in the same court, involving the same Mexican title, that court properly could consider under the decisions of Lockhart v. Johnson, 181 U.S. 516, 520, 21 S. Ct. 665, 45 L.Ed. 979; Criscuolo v. Atlas Imp. Diesel Engine Co. (C.C.A.9) 84 F. (2d) 273, 275; National Fire Ins. Co. v. Thompson, 281 U.S. 331, 336, 50 S.Ct. 288, 290, 74 L.Ed. 881.

We pursue the consideration of the conduct of the United States in this case under the criterion laid down by Justice Miller. That criterion is that the evidence offered to cancel a patent of the United States must be evidence that "commands respect." U. S. v. Maxwell Land-Grant Co., 121 U.S. 325, 381, 382, 7 S.Ct. 1015, 30 L.Ed. 949. We have seen the holding of the obvious by the Supreme Court that the United States is bound to the bona fides towards its adverse citizen litigant, at least as great as that of private persons.

It is, therefore, pertinent to note that the court below had, in its records, the case of Bouldin v. Phelps, involving the same grant to Castro; that in that case the United States District Attorney, appearing for the Commandant in charge of Mare Island, and an attorney, appearing separately for the United States itself, there sought to prove, *and succeeded in proving,* that the Castro claim could not defeat the title of the United States acquired by the cession of the Treaty of Guadalupe Hidalgo, because the alleged grant was fraudulently executed. Bouldin v. Phelps, supra.

Entirely apart from the question of ethics involved, is that of the effect of this purposeful shift of position as to the validity of the Castro grant, within the judicial knowledge of the court below, on the right of the government, in a court of equity, to attempt to justify a search of the record in the Bissell and Aspinwall case, for the original Castro grant, as the place where last seen, when it knew it was not last seen there.

We hold that no search has been made to justify the proof of the Castro grant as an ancient document.

■ (c) **Even if the execution by the Mexican government of a document in words of a grant to Castro had been shown, he did not acquire title, because the duplicate was not shown to have been filed in the Mexican archives.**

Even if we were to consider the testimony in the Bissell and Aspinwall case it shows no grant to Castro. The Supreme Court has repeatedly held that the Republic of Mexico has not granted lands in the territory ultimately ceded to the United States unless it appears that the "grant from the Mexican government had been 'deposited and recorded in the proper public office, among the public archives of the republic.'" Berreyesa v. U. S., 154 U.S. 623, 14 S.Ct. 1179, 23 L.Ed. 913.

That decision cites and relies on the following cases: United States v. Cambuston, 20 How. 59, 64, 15 L.Ed. 828; United States v. Castro, 24 How. 346, 349, 16 L.Ed. 659; United States v. Knight's Adm'r, 1 Black, 227, 251, 17 L.Ed. 76; Peralta v. U. S., 3 Wall. 434, 440, 18 L. Ed. 221. All of these sustain the proposition there laid down.

If we were to seek a reason for the requirement that the grant arose from the deposit and recordation, it is suggested by the finding, in the Bouldin Case, supra, of fraud in the execution of the Castro grant

by the Mexican Governor, after he had ceased to occupy the office. There are many reported cases in the federal courts upon similar charges of fraud.

Nowhere in the record of the Bissell Case is it shown that there was any deposit or recordation in the public archives of the Republic of Mexico of the claimed grant to Castro. Not only is there a failure to show a deposit in the Mexican archives, but Governor Alvarado, who claimed to have executed a grant to Castro, testified:

"Q. Was there any record of said grant kept in the archives? A. I do not remember.

"Q. Was it usual to keep a record of such grants? A. There was a book in which an entry was made of such grants generally though the Secretary might forget it. * * *

"Q. Why did you not *as was your usual custom first make a decree annexed to the Expedient and then make the grant on a separate piece of paper?* A. Because. I was sufficiently well satisfied with what I did." (Italics supplied.)

The espediente is the recordation of the successive steps in the acquisition of title of California lands under the then prevailing Mexican law. The Supreme Court in the case of United States v. Knight's Adm'r, 1 Black (66 U.S.) 227, 245, 246, 17 L.Ed. 76, has described the documents necessary for recordation made in the espediente, as follows: "These several papers—that is, the petition, with the diseño annexed, the order of reference, the informé, the decree of concession, *and the copy of the grant,* appended together in the order mentioned—constitute a complete espediente, within the meaning of the Mexican law." (Italics supplied.)

In the record before the Board of Land Commissioners appears a full transcript of the espediente as claimed by the government. It contains the petition, the order of reference, and the informé. It does not contain either the original, a duplicate, or a copy of the grant to Castro. If it were admissible it would defeat the government's contention.

(d) **There is no evidence of even a possessory right in or possession by Castro.**

The government claims that the Castro claim was confirmable upon the basis of the incomplete *espediente* plus possession. It does not claim, and cannot claim, that mere possession in the absence of some showing upon which to base a grant warrants a confirmation of title. U. S. v. Montalva De Serrano (1866) 5 Wall. (72 U.S.) 451, 18 L.Ed. 494; Miller v. Dale (1875) 92 U.S. 473, 23 L.Ed. 735; Romero v. U. S. (1863) 1 Wall. (68 U.S.) 721, 17 L.Ed. 627.

The only evidence upon which the claim of possession even colorably could be asserted is in the depositions before the Land Commission, taken after the United States had acquired whatever Castro claimed to have owned. The record containing these depositions we hold, infra, cannot be considered in evidence here, and, therefore, we hold that the government has not established any right in Castro based upon possession.

Even if we were to consider this evidence, it does not show that Castro's occupation of the Island, such as it was, was *exclusive.* It is entirely silent on this point. After putting horses on the Island, Castro went away with his brother; he did not live on the Island; he did not cultivate it; he did not make a home there; he merely pastured a few horses in the care of Indian caretakers. As to the swamp and overflowed portion of Mare Island as distinguished from its upland, it is a fair inference that the horses were pastured on the 700 to 800 acres of upland and not in the swamp.

That this is not a sufficient showing of possession to satisfy the standards established by the federal decisions is apparent from U. S. v. Teschmaker (1859) 22 How. (63 U.S.) 392, 402 to 404, 16 L.Ed. 353; U. S. v. Vallejo (1859) 22 How. (63 U.S.) 416, 16 L.Ed. 359; Whitney v. U. S. (1897) 167 U.S. 529, 546, 17 S.Ct. 857, 42 L.Ed. 263; Bergere v. U. S. (1897) 168 U.S. 66, 79, 80, 18 S.Ct. 4, 42 L.Ed. 383; U. S. v. Polack (1857) 27 Fed.Cas. 580, 584, 585, No. 16,061; U. S. v. De Haro (1862) 25 Fed.Cas. 805, 807, 808, No. 14,939.

Furthermore, the claimed Castro grant is of a certain place *by name* and without the mention or description of the boundaries. Hence, even if the horses and the Indians indicated possession of some part of Mare Island, the occupancy of the swamp land described by Survey No. 34 must be specifically shown. Nothing of the kind is shown by the depositions in the case before the Land Commission, even if they were admissible. The leading case establishing this rule is Higuera's Heirs v. U. S. (1864) 5 Wall. (72 U.S.) 827, 833, 834, 18

L.Ed..469. In that case the Supreme Court of the United States said: "Concessions or grants of land by Mexican governors were of three kinds, and in some respects the rules applicable to their construction are widely different. They were concessions or grants by specific boundaries, where, of course, the donee is entitled to the entire tract or concession, or grants by quantity, as of one or more leagues of land situate at some designated place, or within a larger tract described by what are called out-boundaries, where the donee is entitled to the quantity specified and no more, *or grants or concessions of a certain place or rancho by some particular name, either with or without specific boundaries, where the donee is entitled to the tract according to the boundaries, if boundaries are given, and if not, according to the extent and limits of the tract or rancho as shown by the proofs of settlement and possession.*" (Italics supplied.)

This rule has found repeated expression in the later decisions of the United States Supreme Court. See, as illustrative: Alviso v. U. S. (1869) 8 Wall. (75 U.S.) 337, 339, 19 L.Ed. 305; Williams v. U. S. (1875) 92 U.S. 457, 23 L.Ed. 497; U. S. v. McLaughlin (1888) 127 U. S. 428, 448, 8 S. Ct. 1177, 32 L.Ed. 213.

Not only has this rule been frequently stated (and, so far as we have been able to find, without any dissent whatsoever), but it has also been applied in a number of instances. Thus, in the Alviso Case the grant under consideration was of a place known as "Milpitas," as to which the Supreme Court said (8 Wall. 337, 340, 19 L.Ed. 305): "It is also a grant of a certain place by name, and *as the boundaries are not given, its extent and limits must be shown by the settlement and possession of the grantee.*" (Italics supplied.) The court went on to consider this question and, in view of conflicting evidence, upheld the judgment of the court below approving the third survey of the tract.

See, also, U. S. v. Chaboya (1862) 25 Fed.Cas. 371, No. 14,769.

We therefore hold that, in so far as concerns any direct evidence of the claimed grant to Castro, offered in the instant case, there is none. We therefore proceed to the consideration of the effect on the patents of the suit and decree of the District Court in United States v. Bissell and Aspinwall.

IV. The grant to California by the act of 1850 was a grant in præsenti. It transferred to California the entire equitable interest in the lands, the United States thereafter holding the bare legal title. It removed the swamp and overflow area from the "public lands." Thereafter they were no longer lands from which could be made a presidential reservation "from sale" or "of public lands."

On November 6, 1850, 6 weeks after the grant to California, President Fillmore attempted to make a reservation of Mare Island "from sale," as follows:

"The President of the United States *exempts and reserves from sale,* for public purposes, the following tracts or parcels of land in the State of California: * * *

"On the eastern side of the Bay of San Pablo.

"6th. Mare Island.

"7th. The land on the eastern side of Mare Island Straits, beginning at the high hills between those Straits and the City of Benecia, about 2000 to 2500 yards from the former, and extending in a line nearly parallel to it, to a point opposite the northern extremity of Mare Island, and thence to the Straits so as to join them at a point about 800 yards north of the northermost high hills on the eastern side of the Straits." (Italics supplied.)

On February 11, 1853, a second reservation was made. This reservation was confined by the express provision of the congressional act of August 31, 1852, to a "reservation of *public lands,*" the act providing that the Secretary of the Navy is "* * * authorized and directed to select a site for a navy-yard and naval depot in the bay of San Francisco, in California, or neighboring waters, either by *purchase* or by reservation of *public lands,* as the case may be." (Italics supplied.) Section 3 (10 Stat. 104).

It will be noted that neither the reservation "from sale" nor of "Public Lands" purports to be or is an exercise of eminent domain, by which the United States sought to deprive California of her interest in the lands. The act expressly provides for "purchase" of any outstanding interest. It is immaterial under the act whether the outstanding interest be in California or in one holding by Mexican grant prior to the Treaty of Guadalupe Hidalgo. On April 2, 1853, the Secretary of the Navy requested the Attorney General's opinion as to

whether under the provisions of the Act of March 3, 1853 (10 Stat. 220), the funds appropriated therein may legally be expended for certain objects of construction at Mare Island. This act appropriated the sum of $100,000 for such purpose, with the provision "that before this sum shall be expended, the Attorney-General of the United States shall decide that the United States have good title to the land upon which the buildings are to be erected." 10 Stat. 223.

Attorney General Cushing in his reply of the same date stated:

"I recommend therefor as indispensable prerequisites to any lawful expenditure of public money on Mare Island—

"First, that due investigation be had, through the District Attorney of the Northern District of California, or otherwise, into the claim of Henry Sanford, and any other ground of individual claim of date *subsequent to the conquest.*

"Secondly, that the State of California be invited to relinquish to the United States whatever claim, if any, she may have, to the shores or the *overflowed* land of Mare Island." (Italics supplied.)

Congress in passing the act must have had the same view as to California's title as the Attorney General. California never relinquished the swamp and overflowed lands in the patents here attacked, though it did certain lands to the eastward of those in the patents.

The purported reservation of 1853 comprised: " * * * That the tract of land in the Bay of San Francisco bounded by the Bay of San Pablo, the Straits of Carquines and Napa Creek, known as Mare Island, *together with all its appendages of Tule or Marsh land ordinarily reputed to belong to said island,* and the harbors, waters and anchorages connected therewith and necessary to the use of the same, be reserved to the United States for public uses." (Italics supplied.)

The question of the power of Congress to divest a state to which it granted swamp and overflowed lands by the 1850 act early came before the Supreme Court. In the case of French v. Fyan, 93 U.S. 169, 23 L. Ed. 812, Congress, by that act, had granted the lands in question to Missouri. Later, in 1857, as here to California, a patent was issued to the State of Missouri. In the interim, under a congressional grant of 1852, the swamp and overflowed lands were

certified in 1854 to the Missouri Pacific Railway Company. If it constituted a reservation at all, this certification of the lands by the Secretary of the Interior to the railway under the act of Congress of 1852 (10 Stat. 8) was as complete a reservation of the swamp and overflowed lands "from sale" and from the "Public Lands" as was the withdrawal of swamp and overflowed lands in dispute under the act of August, 1852.

The Supreme Court held that the withdrawal by certification of the lands to the railway under the act of 1852 could not divest Missouri of its title to the swamp and overflowed lands granted in 1850, since the earlier act was a grant in præsenti to that state: "This court has decided more than once that the swamp-land act was a grant *in præsenti,* by which the title to those lands passed at once to the State in which they lay, except as to States admitted to the Union after its passage. The patent, therefore, which is the evidence that the lands contained in it had been identified as swamp-lands under that act, relates back and gives certainty to the title of the date of the grant. As that act was passed two years prior to the act granting lands to the State of Missouri, for the benefit of the railroad, the defendant had the better title on the face of the papers, notwithstanding the certificate to the railroad company for the same land was issued three years before the patent to the State, under the act of 1850. For while the title under the swamp-land act, being a present grant, takes effect as of the date of that act, or of the admission of the State into the Union, when this occurred afterwards, there can be no claim of an earlier date than that of the act of 1852, two years later, for the inception of the title of the railroad company." French v. Fyan, 93 U. S. 169, 170, 23 L.Ed. 812.

In many succeeding cases the Supreme Court has reaffirmed this decision that the grant of 1850 was such a present grant.

The principle established in French v. Fyan has recently been reaffirmed by the Supreme Court in U. S. v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 303, 70 L.Ed. 539, where the cases and decision of the Secretaries of the Interior are reviewed:

"By the Act of September 28, 1850, Congress granted to the several states the whole of the swamp lands therein then remaining unsold. 9 Stat. 519, c. 84. The

first section was in the usual terms of a grant *in præsenti*, its words being that the lands described 'shall be, and the same are hereby, granted.' The second section charged the Secretary of the Interior with the duty of making out and transmitting to the Governor of the state accurate lists and plats of the lands described, and of causing patents to issue at the Governor's request, and it then declared that on the issue of the patent the fee simple to the lands should vest in the state. The third section directed that, in making out the lists and plats, all legal subdivisions the greater part of which was wet and unfit for cultivation should be included, but where the greater part was not of that character the whole should be excluded. The question soon arose whether, in view of the terms of the first and second sections, the grant was *in præsenti* and took effect on the date of the act, or rested in promise until the issue of the patent and took effect then. The then Secretary of the Interior, Mr. Stuart, concluded that the grant was *in præsenti* in the sense that the state became immediately invested with an inchoate title which would become perfect, as of the date of the act, when the land was identified and the patent issued. 1 Lester's Land Laws, 549. ['As the grants are regarded as taking effect from the date of the laws making them respectively, and as *vesting the inchoate title in the states,* it follows that any subsequent *sale or location of swamp and overflowed lands must be held to be illegal* and the purchase money refunded, or a change of location ordered'. 1 Lester's Land Laws.] That conclusion was accepted by his successors, was approved by the Attorney General (9 Op.Attys.Gen. 253) ['This difficulty, therefore, is solved if the mere grant (of 1850), as you call it, gave the State a right to the land from the day of its date. That it did so there can be no doubt. In an opinion which I sent you on the 7th of June, 1857, concerning one of the same laws now under consideration, I said that a grant by Congress does of itself, *proprio vigore, pass to the grantee all the estate which the United States* had in the subject matter of the grant, except what is expressly excepted.' * * * 9 Op.Attys.Gen. 253.] was adopted by the courts of last resort in the states affected, and was sustained by this court in many cases. (French v. Fyan, 93 U.S. 169, 170, 23 L.Ed. 812; Wright v. Roseberry, 121 U.S. 488, 500, et seq., 7 S.Ct. 985, 30 L. Ed. 1039; Rogers Locomotive Works v.

Emigrant Co., 164 U.S. 559, 570, 17 S.Ct. 188, 41 L.Ed. 552; Work v. Louisiana, 269 U.S. 250, 46 S.Ct. 92, 70 L.Ed. 259.) A case of special interest here is Rice v. Sioux City & St. Paul R. R. Co., 110 U.S. 695, 4 S.Ct. 177, 28 L.Ed. 289. The question there was whether the act of 1850 operated, when Minnesota became a state in 1858, to grant to her the swamp lands therein. The court answered in the negative, saying that the act of 1850 'operated as a grant *in præsenti* to the states then in existence'; that it 'was to operate upon existing things, and with reference to an existing state of facts'; that it '*was to take effect at once,* between an existing grantor and several separate existing grantees'; and that, as Minnesota was not then a state, the act made no grant to her." (Italics supplied.) United States v. Minnesota, 270 U.S. 181, 202, 203, 46 S.Ct. 298, 70 L.Ed. 539.

In that case the grant to Minnesota by the act of 1860 (12 Stat. 3 [see 43 U.S.C.A. § 988]) differed from that to California in specifically excepting from a grant in præsenti "all lands which might be reserved, sold, or disposed of (in pursuance of any law theretofore enacted) prior to the confirmation of title under the grant—the confirmation being the issue of patent." 270 U.S. 181, 204, 205, 46 S.Ct. 298, 304, 70 L. Ed. 539. Under this exception in the grant it was held that a prior treaty with the Indians constituted a reservation of the lands, and thus was within the excepting clause of the act of 1860. The court also holds that even in the absence of such a specific exception, of lands reserved prior to the grant, these would be "impliedly excepted." In considering the Minnesota act of 1860 as a grant in præsenti, the court again relies on the opinions of the Attorneys General and established practice of the Interior Department.

"The act of 1860 was construed as we here construe it by Secretary Delano in 1874 (1 Copp's P.L.L. 475), and by Secretary Schurz in 1877 (2 Copp, 1081); and their construction was adopted and applied by their successors up to the time of this suit, and was approved by the Attorney General in 1906, 25 Op.Attys.Gen. 626. So, even if there were some uncertainty in the act, we should regard this long-continued and uniform practice of the officers charged with the duty of administering it as persuasively determinative of its construction." United States v. Minnesota,

supra, 270 U.S. 181, 205, 46 S.Ct. 298, 304, 70 L.Ed. 539.

The opinion of Attorney General Moody so accepted by the Supreme Court was upon a case not as strong as that of appellants' here. After the 1860 grant to Minnesota, the Congress, in 1872, authorized the Department of Agriculture to withdraw for forestry certain of the swamp and overflowed lands, just as did the act of August, 1852, authorize the Secretary of the Navy to withdraw the lands here patented. The withdrawal of the Minnesota lands was prior to patent under the act of 1860, and the question was whether the congressional withdrawal of the lands for forestry lands divested the state of its rights under the grant of 1860. The case was weaker for the Minnesota than ·for the California claim here, for here the swamp land patents have been issued. In deciding that the congressional withdrawal did not divest Minnesota of its rights under the earlier grant, the Attorney General says:

"Your first question is whether the swamp land grant is a grant *in præsenti* to the State of Minnesota of all the swamp lands therein, to be afterwards identified.

"I shall not dwell upon this question, because your Department and the courts have frequently held that it is such a grant.

"It has been held that the legal title does not pass until patent, and that when it does pass it relates to the date of the granting act. (Rogers Locomotive Works v. Emigrant Company, 164 U.S. 559, 570 [17 S.Ct. 188, 41 L.Ed. 552]; Michigan Land & Lumber Company v. Rust, 168 U. S. 589, 591 [18 S.Ct. 208, 42 L.Ed. 591].)

"Aside from the decisions, it seems clear that the *intention of Congress was to give the beneficial title immediately to the State of all swamp lands in it,* as against claimants attempting to initiate rights afterwards, except under laws *theretofore* enacted." (Italics supplied.) 25 Op.Attys. Gen. 628, 629.

We thus see that the Supreme Court in 1926, in United States v. Minnesota, supra, reaffirmed the holding of French v. Fyan, supra, in 1876, that a subsequent congressional reservation cannot divest a state of its grant in præsenti of swamp and overflowed lands under the act of 1850. In 1886 the same question came before Mr. Justice Field and Circuit Judge Sawyer with reference to a claimed divesting of California by the act of August, 1852, *of the lands identical in character with that covered by the patents in this appeal,* in San Francisco Sav. Union v. Irwin (C.C.) 28 F. 708, 709, 715.

Mr. Justice Field relies on French v. Fyan and other cases as establishing the present character of the grant to California of the act of 1850, and holds that the presidential reservation under the act of August, 1852, *the reservation here relied on to void California's patent,* did not divest California of her title.

At the time of the trial there had been no certification of the lands to California by the Secretary of the Interior. The plaintiff's case rested on the title granted by the state patent. The government's defense was that the act of 1850 was not a grant in præsenti. Upon this it asserted two propositions: (1) That, since California had no title, the lands were public lands of the United States and hence subject to and withdrawn by the presidential withdrawal of 1853; and (2) that, before listing the lands as swamp and overflowed to the state by the Secretary of the Interior, California had no title, and hence plaintiffs' showing that the lands were in fact swamp land overflowed in 1850 was not competent evidence.

In disposing of these contentions Mr. Justice Field, sitting with Circuit Judge Sawyer, held:

"This is an action to recover possession of a tract of land situated partly in the county of Napa, and partly in the county of Solano, consisting of 7,413 acres and a fraction of an acre. It is alleged to be swamp and overflowed land, and that the title to it therefore passed to the state by the Act of congress of September 28, 1850, 'to enable the state of Arkansas and other states to reclaim the swamp lands within their limits.' 9 Stat. 519.

"The first section of that act grants to the state of Arkansas 'the whole of those swamp and overflowed lands, made unfit thereby for cultivation,' which were unsold at the date of its passage. The fourth section extends the provisions of the act to, and confers their benefits upon, each of the other states of the Union in which swamp and overflowed lands are situated.

"The act is a grant in præsenti, to each state then in the Union, of lands situated within its limits of the quality described. Its language is that they 'shall be, and the

same are hereby, granted to said state,'—*words which import an immediate transfer of interest, and not one in the future.* * *

"On the seventh of April, 1874, the state, through her properly authorized officers, issued a patent of the tract in controversy to one George W. Pearson, describing it as swamp and overflowed land, and giving its metes and bounds. Through him, by various mesne conveyances, the plaintiffs trace their title, each having acquired an undivided one-third interest in the premises as tenant in common with the others. The state, by various enactments, had provided for the sale of lands of this character, and no question is made as to the conformity of the proceedings with their requirements in the issue of the patent. *The objection taken is to the acquisition of any title by the state until the lands had been listed and patented to her by the United States.* The patent of the state is the conveyance of whatever interest she had *at that time* in the land; and, if it were within the description of swamp and overflowed land, her interest was paramount to that of the United States, unless their title antedates the act of 1850. * * * In the absence of any action of the secretary of the interior which would be conclusive in the matter as against collateral attack, the testimony of witnesses having knowledge of the subject as to the character of the land was admissible under the decisions mentioned. That testimony clearly showed that the land was subject to periodical overflow by the rising of the tides in the bay of San Pablo, so as to make it unfit to raise the ordinary crops of the country without protecting it with levees from such overflow. * * *

"We do not give any weight to the fact that in 1853, by order of the president of the United States, Mare island was reserved, with all its alleged appendages of tule or marsh lands ordinarily reputed to belong to such island; *for, if such reservation was intended to include all the swamp and overflowed lands in controversy, it was to that extent inoperative,—the title, as we have already seen, having passed to the state by the act of September 28, 1850.*" (Italics supplied.) San Francisco Sav. Union v. Irwin (C.C.) 28 F. 708, 709, 712, 715.

Mr. Justice Field delivered the opinion in the Savings Union Case on a trip to his circuit in July, 1886. At the succeeding October term of the Supreme Court he re-affirmed his holding in the Circuit Court that the grant to California was in præsenti in his opinion in the case of Wright v. Roseberry, 121 U.S. 488, 7 S.Ct. 985, 30 L. Ed. 1039.

In Wright v. Roseberry, Mr. Justice Field again relies on French v. Fyan as establishing the present character of the grant of the act of 1850, and that thereafter the state cannot be divested by subsequent reservation. He also relies on the same opinions of the Secretaries of the Interior, Stuart and Schurz, cited as establishing the law in United States v. Minnesota, which, in turn, cites, at page 205 of 270 U.S., at page 304 of 46 S.Ct., 70 L.Ed. 539, Wright v. Roseberry as establishing the present character of the swamp land grant to the states. One of the questions in the Roseberry Case was whether, the 1850 grant being in præsenti, the holder of the deed from the state could establish by parol evidence the overflowed character of the land at that date. The Supreme Court held it could be so shown because after the 1850 grant the lands "were not afterwards *public lands* at the disposal of the United States."

"The court below held, and placed its decision upon the ground, that, because the commissioner of the general land-office had not certified the lands in controversy to the state as swamp and overflowed, when this action was commenced in 1870, there was no title in the state by the grant of 1850 which could be enforced, thus making the investiture of title depend upon the act of the commissioner instead of the act of congress; whereas the certificate of that officer, when the previous requirements of the law have been complied with, is only an official recognition that the lands are of the character designated, and of the completeness of their segregation. The decision is in conflict with its previous decisions, and with the adjudged cases to which our attention has been called.

"In Sacramento Valley Reclamation Company v. Cook [61 Cal. 341] decided as late as 1882, that court recognized the swamp-land grant of 1850 as one in præsenti. Its language was: 'It is as well settled as anything can be by the courts that the donation of swamp and overflowed lands by the United States to the states in which such lands were situated at the date of the passage of the act of September 28, 1850, "was a grant *in præsenti,* by which

the title to those lands passed at once to the states in which they lay, except as to states admitted into the Union after its passage," ' citing French v. Fyan, 93 U.S. 169 [23 L.Ed. 812].

"For the error in holding that the certificate of the commissioner was necessary to pass the title of the demanded premises to the state, the case must go back for a new trial, when the parties will be at liberty to show whether or not the lands in controversy were in fact swamp and overflowed on the day that the swamp-land act of 1850 took effect. *If they are proved to have been such lands at that date, they were not afterwards subject to pre-emption by settlers. They were not afterwards public lands at the disposal of the United States. Parties settling upon such lands must be deemed to have done so with notice of the title of the state,* and, after the segregation map was deposited with the surveyor general of the state, with notice also that they were actually segregated and claimed by the state as such lands.

"Judgment reversed, and cause remanded for further proceedings not inconsistent with this opinion." (Italics supplied.) Wright v. Roseberry, 121 U.S. 488, 520, 521, 7 S.Ct. 985, 1000, 30 L.Ed. 1039.

Not thereafter being "public lands" of the United States, they therefore could not be withdrawn by the act of 1852 authorizing a reservation from "public lands" as here claimed by the United States to void the instant patents to California.

The appeal in San Francisco Savings Union v. Irwin (136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540) came before the Supreme Court shortly after Wright v. Roseberry. The United States appeared on the appeal, giving the decision a finality it could not have against Commandant Irwin, a mere administrative officer. The government's bill of exceptions abandoned the claim that the reservation under the act of 1852 divested California of the lands now in the patents sought to be voided. The sole point raised was whether, there being a grant in præsenti, and the lands no longer public lands, as held in Wright v. Roseberry, but no certification of the lands to the state, the overflowed character of the land in 1850 could be shown by parol. The Supreme Court held on the authority of Wright v. Roseberry that it could. Irwin v. San Francisco Savings Union, 136 U.S. 578, 580, 10 S.Ct. 1064, 34 L.Ed. 540.

The government here relies on District Judge Van Fleet's opinion in Sawyer v. Osterhaus (D.C.) 212 F. 765, as overruling Justice Field's and Circuit Judge Sawyer's decision in the Circuit Court in the Irwin Case. This was a suit in ejectment brought by Sawyer against Osterhaus, commandant of Mare Island Navy Yard, and, having in possession the swamp lands in Survey No. 34, here in question. Sawyer deraigned title from the Darlington patent. Since California then had not acquired its patent from the United States, Sawyer could not show legal title. The court rested its decision, denying ejectment on the ground "that plaintiff has wholly failed to make out, as was incumbent upon him, a legal title to the premises in suit." 212 F. 765, 775.

Continuing as a dictum, but declaring he did not rest his decision on it because "it was not urged upon the attention of the court," Judge Van Fleet says, "I think" that the congressional act of 1850 did not constitute a grant in præsenti, and hence the two naval reservations would defeat the right of California to a patent. Not only is this a mere dictum, but, had it been a holding, it decided nothing in favor of the United States. The Attorney General made a special appearance in the case, claiming it should be dismissed because the United States was the real party in interest, and had not given permission to be sued. The motion was denied on the ground that the title of the United States was not involved. Sawyer v. Osterhaus (D.C.) 195 F. 655. A judgment for or against the commandant's possessory right would not estop either the United States or the California claimants in a subsequent suit between them. Hussey v. U. S., 222 U.S. 88, 32 S.Ct. 33, 56 L.Ed. 106; Carr v. U. S., 98 U.S. 433, 437, 25 L.Ed. 209.

This District Court dictum was many years before U. S. v. Minnesota, and is of no weight against the latter's holding of the present character of the grant to California. Judge Van Fleet's error rested on the assumption that the grant of 1850 is a grant in futuro vesting nothing in California until the date of the certification of the lands by the Secretary of the Interior or of the ensuing United States patent, and that before that time the swamp lands remained "public lands" subject to a presidential reservation. He cites certain decisions on school land grants as supporting this thesis, failing to note the essential

difference between the present grant of swamp lands and the future and promissory quality of the school land grants.

The school land case of Heydenfeldt v. Daney Gold & S. Min. Co., 93 U.S. 634, 638, 639, 23 L.Ed. 995, cited by Judge Van Fleet, and which precedes Wright v. Roseberry, construes the school land grant as in futuro. Wisconsin v. Hitchcock, 201 U. S. 202, 213, 26 S.Ct. 498, 50 L.Ed. 727, also cited by him, rests on United States v. Thomas, 151 U.S. 577, 582, 14 S.Ct. 426, 38 L.Ed. 276. They hold merely that lands of which the Indians had a right of occupancy *prior* to the school land grant, were not included in it. In United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599, the school land grant to Oregon was held to be in futuro and not to prevent an intervening reservation for forestry purposes.

All these cases precede United States v. Minnesota, 270 U.S. 181, 210, 46 S.Ct. 298, 70 L.Ed. 539, where the distinction between the two characters of grant is clearly made. One of the cases relied on in Sawyer v. Osterhaus, supra, is Minnesota v. Hitchcock, 185 U.S. 373, 385, 22 S.Ct. 650, 46 L.Ed. 954, deciding the future vesting of a school land grant to Minnesota. In United States v. Minnesota, the school grant of the Hitchcock Case is distinguished from swamp land grants, as follows: "The case of Minnesota v. Hitchcock, 185 U.S. 373, 385, 22 S.Ct. 650, 46 L.Ed. 954, is cited as making for a different conclusion; but it does not do so. The question there was whether the state was entitled, under the school land grant, to sections 16 and 36 in the part of the Red Lake reservation which was ceded under the act of 1889. That grant was expressed in words of promise, not of present grant. Title was to pass when the lands were identified by survey, if they were *then* public; and if *at that time* they were not public but otherwise disposed of, the state was to be entitled to other lands in their stead." (Italics supplied.) United States v. Minnesota, supra, 270 U.S. 181, 210, 46 S.Ct. 298, 306, 70 L.Ed. 539.

The court regarded the holding that the swamp land grants were in præsenti was necessary to the decision of United States v. Minnesota. If they were in futuro, there would have been no question that the Indian treaties of 1863 and 1865 took the swamp and overflowed lands of the 1860 grant which had not then been certified to the state. On the question whether a treaty with another nation had some higher constitutional power to divest Minnesota's title than a statute reserving the lands, the court expresses grave doubt, but avoids deciding it by a construction of the treaty's terms as not intending such taking from the state. U. S. v. Minnesota, supra, 270 U.S. 181, 208, 209, 46 S.Ct. 298, 70 L.Ed. 539. If French v. Fyan, supra, and the succeeding cases had not settled the question of the immediate vesting of the full equitable title of the swamp lands in California, a similar construction of the act of August, 1852, would lead us to conclude that Congress did not intend to take any lands from California of which lands it had vested in California the full equitable title; and that the 1850 reservation of Mare Island "from sale" contemplated the upland portion of the island, which, until recently, contained all the navy yard plant, and not California's swamp and overflowed lands on its then doubtful borders.

The patents and appellee's admission of the swampy character of the lands, and the case of French v. Fyan and succeeding cases, reviewed above, conclusively establish that, whatever title the United States had prior to the grant of September 28, 1850, thereafter, at most, it held the bare legal title in trust for California, to which then had been transferred, in præsenti, the entire equitable interest.

We therefore hold that neither of the attempted reservations made by the President and the Secretary of the Navy after the congressional grant of 1850 divested California of its full equitable interest vested by the grant.

V. The United States, seeking equity, can take no benefit against California and its successors from the decree in United States v. Bissell and Aspinwall confirming Castro's invalid Mexican title, because

(a) If that suit, in its ordinary course, would be binding upon California, as the then holder of the equitable title under the prior grant of 1850, in this case it would not so be binding because the United States, holding whatever legal title it acquired from Mexico, and required by the statute to defend it as California's trustee against the Castro title, prior to appearing against that title, acquired it for its own governmental use and thereafter appeared before the Land Commission, and waging a pretended adversary proceeding in which

its private interest was adverse to its trust, carried it to a decree adverse to California;

(a) We consider the contention of the government relative to the advantage it may take of the District Court decree of 1930 rendered in the Bissell and Aspinwall case, having in view that its burden of proof to cause cancellation of the patents can be sustained only on "that class of evidence which commands respect."

The United States contends that the California title to the lands was defeated by the 1930 decree of the District Court, given on appeal in the proceedings before the Land Board created by the act of Congress of 1851. The act provides for filing with the Board of Land Commissioners of all claims to land based on Mexican titles and their adjudication as against the United States.

The United States' briefs here claim that whatever rights California held when the litigation was pending before the Land Board, then were in the United States and that California could not there appear as a party. We here consider this contention, disregarding any effect of the patent of 1928 as reverting the transfer of the legal title back to 1850. We have seen that, since the lands are admitted to be swamp and overflowed, the United States, prior to the contested patents, held a bare legal title in trust for California. As was said by the Supreme Court, in a case determining the condition of unpatented swamp and overflowed lands, by applying to them the law regarding the homesteader: " 'The *government holds the legal title in trust for him, and he may not be dispossessed of his equitable rights without due process of law.* Due process in such case implies notice and a hearing. But this does not require that the hearing must be in the courts, or forbid an inquiry and determination in the land department.' Orchard v. Alexander, 157 U.S. 372, 383, 15 S.Ct. 635, 639 [39 L.Ed. 737]." (Italics supplied.) Brown v. Hitchcock, 173 U.S. 473, 478, 19 S.Ct. 485, 487, 43 L.Ed. 772.

Whatever title Castro had, had been acquired by Messrs. Bissell and Aspinwall. They presented their claims to the Land Board, and issue was joined by the United States, the adversary party created by the statute. Although appellants, before the decree rendered in 1930, held the 1928 patents giving them the legal title, they were never made parties to the action, nor asked to present their rights amicus curiæ. The decree was obtained without their knowledge.

While the proceedings were pending, the United States in 1853 bought from Bissell and Aspinwall their claim under the Castro title. We thus have the United States claiming here that it acquired the Mexican title from its adversary parties and then proceeded to the trial of the controversy as to its validity in simulated opposition to litigants no longer having an interest, and that it thereby established in itself a title adverse to California.

The depositions taken in this situation, reprehensible in a court of law, and, if anything, more so in a court of equity, show a most perfunctory cross-examination of the witnesses, presumably offered by parties opposed to the government, but, in fact, representing its acquired interest. The result of such an examination by pretended adversaries seeking the single objective of a perfect title gave to Governor Alvarado and the other witnesses the opportunity to disprove the fraud suggested in some of the questions and found in the Bouldin v. Phelps Case, supra. In its pretended adversary position the government "rode to a fall" to perfect the title it had acquired.

However, this court is not required to measure the industry and effectiveness of the performance of the government's statutory duty and obligation to California to resist the Castro claim. Once the government acquired the interest adverse to California, its cestui, it can take no advantage from the proceeding before the commission.

"We have no desire to weaken or qualify in any way the wholesome doctrine laid down by this court in the case of Michoud v. Girod, 4 How. 503 [11 L.Ed. 1076], that a trustee cannot legally purchase on his own account that which his duty requires him to sell on account of another, nor purchase on account of another that which he sells upon his own account; in other words, he cannot unite the two opposite characters of buyer and seller. So jealous is the law of dealings of this character by persons holding confidential relations to each other that the *cestui que trust* may avoid the transaction, even though the sale was without fraud, the property sold for its full value, and no actual injury to his interests be proven." Hoyt v. Latham, 143 U.S. 553, 566, 12 S.Ct. 568, 572, 36 L.Ed. 259.

"Convinced that the relation of the parties was fiduciary and not merely contractual, we are unable to accept the view thus outlined. It would require a clear case to warrant a court of equity in declaring that the trustees of an express trust, in the very course of their administration of the trust, had acquired a dominant interest in the trust property and in effect a discharge of the trust, through mere inattention or even negligence—not raising an estoppel or amounting to laches—on the part of the parties beneficially interested, or of their executive officers. Conduct merely equivocal, or apparently inconsistent with a vigilant insistence upon the obligations of the trustee, is not sufficient to discharge a trust. The cestui que trust is entitled to rely upon the fidelity of the trustee, until plainly put on guard against him." Chicago, M. & St. P. Ry. Co. v. Des Moines, etc., R. Co., 254 U.S. 196, 220, 41 S.Ct. 81, 90, 65 L.Ed. 219.

On the basis of the government's assumption that California was not a "third persons" and could not appear as a party, because her equity was held in trust by the United States, the government appears in a position to which the language of Mr. Justice Chase seems applicable: "I think that the United States are not absolved in their dealings with citizens from the obligations of honesty by which individuals are usually controlled." Mason v. U. S., 17 Wall. 67, 75, 21 L.Ed. 564.

It does not ameliorate the situation, but rather heightens it, when we consider that the evidence of the depositions so taken shows that Castro did not have any grant of land from the Mexican government under the clear provisions of the Mexican law.

It cannot be said that the United States unconsciously violated its duty to its cestui. On April 9, 1853, over a year before the first deposition was taken, the United States Attorney General Caleb Cushing gave an opinion on the Castro proceedings before the Board of Land Commissioners. 8 Op.Attys.Gen. 422. The review is made with reference to the effect of the purchase by the United States of the Castro title pending these proceedings. His letter to the Secretary of the Navy, in specific language, sustains the contention here made by appellants. Speaking of the purchase of this Castro claim, he says this is done by "the payment of a large sum of money * * * to *silence and extinguish* it:—which, it seems, has accordingly been done." Discussing the further conduct of litigation, he says: "True, the United States may decline to resist the claim of Castro on the pending suit, and, by consent, or by omission to enter an appeal, may, in fact, *take the side of the adversary party,* his claim being vested in them, and allow a final judgment to be entered affirming the grant to Castro. But *I, as Attorney General,* in view of the special duties imposed on me by the acts for the settlement of private land claims in California, and of my general obligation to look after the rights of the United States in the premises, *cannot pursue this course.* I must not admit that the purchase of the Castro claim by the United States operates in any way, either by implication or otherwise, as a waiver of the general rights of the United States in the premises, or as an assent, either express or implied, to the pretended validity of the grant to Castro." (Italics supplied.)

The general rights of the United States referred to included its right as trustee for the State of California to conduct a true adversary contest against the Castro claim. The rights of the State of California are recognized in Attorney General Cushing's opinion, as follows:

"I am satisfied that the State of California may set up, and probably maintain, title, as against the United States, to so much of Mare Island as is subject to overflow by water, whether periodically or otherwise, that is, at least, to all below high water mark. * * *

"In the second place, by an act of Congress, passed the 28th day of September, 1850, all the swamp and other overflowed lands in the State of Arkansas, made thereby unfit for cultivation, are granted to said State; and then the provisions of the act are extended to, and its benefits conferred upon, each of the other States of the union in which such swamp and overflowed lands may be situated. The State of California had already, by act of September 9, 1850, been admitted into the Union, and is, of course, entitled to all the uncultivable overflowed land within its limits, as against the United States."

His opinion further expresses a lawyer's proper doubt that the transaction between Castro grantees and the United States would affect the right of any "adverse claimant save the grantees of Castro." His language is: "In addition to

which it is to be considered, that, whatever might be the legal effect, by way of waiver, estoppel, or otherwise, of any transaction in the premises between Castro's grantees and the United States, probably no such transaction could affect the rights of Sanford, or any *other adverse claimant* save the grantees of Castro. Sanford, *or any other person,* may not be precluded by anything the United States can do, from setting up a claim better than Castro's, that is, denying the validity of the original grant to Castro, and so ousting the United States."

The appellant claims some adjudicatory force to this opinion of the Attorney General. We cannot agree with this contention, but do agree that the prescience of this able lawyer truly recognized the legal principles controlling the action of the government in the Castro litigation before the Board. The appeal to the District Court from the decision of the Land Board was taken by the Attorney General in February, 1856. The judicial farce continued there; the pretended attorneys for the Castro interest resisted the appeal. Then followed, in 1857, an unsigned decree affirming the decision of the Land Board which is described as *"rejecting"* the [Castro] claim." It then proceeds to declare that it is a good and valid claim. Then follows an appeal by the United States to the Supreme Court. Then a vacation of the appeal, no doubt because there was no decree.

The unsigned decree left the case under submission to the court for 73 years. The United States, on April 15, 1930, moved for the decree presented here as foreclosing the State of California. The intent to shut out the State of California by this nonadversary proceeding is openly declared in the 1930 decree's finding that the United States had purchased the Castro title, " * * * and that all persons claiming by, under, or through the Appellants or the Appellees or any of them, are chargeable with notice of this action and of everything that has been done therein, and therefore, that no rights of third persons have intervened or could intervene."

When this decree was rendered, appellants holding the California title were the parties referred to as "claiming by, under, or through" the United States. California then held the United States patent sustaining appellants' claim to the land. The declaration that California or its successors

could not be a party to the action by which its title is claimed to be barred seems to impose a duty on the United States to notify it of the proceeding and ask it to advise the court amicus curiæ as to any defect in Castro's title, about which the Attorney General had expressed such doubt. That it did so is a fitting termination of the whole litigation.

Since the evidence shows the United States conducted the concealed nonadversary proceeding to secure Mare Island as a Naval Station, with the full knowledge that it would embarrass the claim of the State of California to the swamp lands, the situation is not unlike that considered in the case of U. S. v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93.

There the United States, by its bill in equity, sought the cancellation of its patent which had been granted to one Richardson, the holder of the Mexican title, pursuant to a decree of the Board of Land Commissioners. The claim of the United States was that its agent at the hearing before the Commission had betrayed its interest to its adversary, Richardson, by failing to disclose to the Land Board evidence of fraud in the acquisition of the title from Mexico. The court held the betrayal was not shown, it not being alleged that the agent *"was then interested in the* [adversary] *Richardson claim." If such interest had been shown, "the case would have come within the rule which authorizes relief."* U. S. v. Throckmorton, supra, 98 U. S. 61, 69, 25 L.Ed. 93.

The rule referred to as authorizing relief is stated by the court at pages 65 and 66 of 98 U.S., 25 L.Ed. 93, as follows: "But there is an admitted exception to this general rule in cases where, by reason of something done by the successful party to a suit, *there was in fact no adversary trial or decision of the issue in the case.* Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has *never been a*

*real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing."* (Italics supplied.) U. S. v. Throckmorton, supra, 98 U.S. 61, 65, 66, 25 L.Ed. 93.

In equity the difference between the contentions of the United States in the Throckmorton Case and in the case at bar has a profound legal as well as ethical significance. In the former it sought relief against an outstanding title, which would have been given if its agent in the Land Board had been interested in the Mexican claim. Here it asserts the Board's action adjudicated to it the Mexican title in which, not merely it had an interest, but which, previously and unknown to the Land Board, it had acquired in its entirety. It does this purposefully to aid it in holding its Mare Island lands against the claim of its cestui.

The case falls within the rule stated in the Throckmorton Case and the appellants are entitled to the relief. Such relief is not confined to annulling the decree and reopening the Bissell Case for a further hearing on matters alleged to have occurred nearly a century ago. Proper relief here can be given by granting the motion to exclude from evidence the record in the Bissell and Aspinwall case, because "since the 4th day of January, 1853, Bissell and Aspinwall, grantors of the United States, were no longer interested in the premises."

It may be suggested that the majority opinion reasons in a circle, that the majority assume that the United States held the legal title in trust for the state under the Swamp Land Act and that therefore the appellants, as successors in interest, may question the confirmation proceedings; whereas, so it may be urged, until the confirmation proceedings are disposed of no equity in the state is shown which would give it, or appellants as its successors in interest, any standing to attack the proceedings.

This line of argument wholly misconceives the status of California and its successors as recognized by the government's bill, and its burden of proof to obtain its remedy. Implicit in this bill, so recognizing the patents which it seeks to cancel, is the recognition of the status of the United States as holder of the bare legal title in 1850, at the time of the grant to California,

in trust for California as its cestui, having the whole equitable interest.

The situation might be differently conceived if the State of California or its successors in interest were maintaining some sort of a legal proceeding against the government, in which, as complainant, it was seeking to establish title to the land and to procure a patent based upon a final determination of title. There the burden of proof would be upon the state or its successors. In such a suit it well might be argued that in attempting to base their claim upon the trustee and cestui relationship they were seeking to lift themselves from their stance by their own bootstraps.

Here, since the government's bill recognizes the existence of the trustee-cestui relationship of 1850, culminating in the patent of 1928, which it seeks to destroy, it has the heavy burden of proof stated in the authorities cited above to establish the contrary. It is the government which must lift appellants from their stance on the trustee-cestui relationship.

So far as concerns this court, sitting as a court of equity, and considering the relationship of the United States to its cestui, the State of California, we agree with the assignment and specification of error of appellants that the Land Board action had terminated as far as affecting California, when the two litigants merged their adverse interests by the sale to the United States. In equity that case ended before any testimony was taken. So far as concerns the State of California and these appellants, nothing that thereafter occurred, including the decree of April 15, 1930, can, in equity, affect either their equitable or legal rights. In the alternative, it is also arguable, but not necessary to decide, that, if the decree made valid to the United States the invalid Castro title, and hence falsely proved that the lands were not ceded to the United States by the Treaty of Guadalupe Hidalgo and therefore not granted to California in 1850, the United States would hold the Castro title in trust for California.

■ V. (b) In this suit in equity the record in Bissell and Aspinwall's action is not made "conclusive" against appellants by section 15 of the Land Board Act (9 Stat. 634).

The claim of the State of California to the swamp and overflowed lands of Mare Island is that of the interest of a third person alien to the Land Commission action

and to both the noninterested Bissell and Aspinwall and the conflictingly interested United States, as the term "the interest of third persons" is used in section 15 of the act.

Much of the comment on the conduct of the government would not be warranted did it not insist that, by section 15 of the Act of 1851, creating the Land Commission, the record and decree in the Castro proceeding there are "conclusive" against California and its successors in interest. The government insists that, by the decree in that case, California is found to be under the jurisdiction of the Land Board and court and bound by "its decision," and not to have the interest of an alien third person.

Congress, in passing the Land Commission Act of 1851, must have done so in view of its act of granting, in the previous year, to California the vast area of swamp and overflowed lands and California's interest therein as against those of invalid Mexican claims.

Section 15 of the act provides: "That the final decrees rendered by the said commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act shall be conclusive between the United States and the said claimants *only,* and shall not affect the *interests of third persons.*" (Italics supplied.)

The phrase "interests of third persons" in the Act of 1851 as affected by a judgment to which they were not parties, recently, in 1849, had been considered by the Supreme Court in the leading case on that subject, Lord v. Veazie, 8 How. 251, 12 L. Ed. 1067. It was a decision of such importance that it must have been familiar to all the bar and to the Congress. In that case, on motion of "third persons," alien to the action and the writ of error, for its dismissal, the court granted the motion, holding:

"The objection in the case before us is, * * * that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the *interest of third persons,* whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be. * * *

"A judgment in form, thus procured, in the eye of the law is no judgment of the court. It is a nullity, and no writ of error will lie upon it. This writ is, therefore, dismissed." (Italics supplied.)

Lord v. Veazie, 8 How. 251, 255, 12 L. Ed. 1067.

In view of this decision it would require an unequivocal decision of the Supreme Court to establish that California was not intended by Congress to be included in the phrase "interests of third persons" used in the Land Board Act of 1851. There is no such decision.

The government asserts that the Supreme Court has decided that section 15 had made conclusive the decree and record in the proceedings before the Land Commission as against California and its successors in interest by the following holding:

"The term 'third persons,' as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the *government* in disposing of the property. * * *

"As *against the government* this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming *under* the government by title *subsequent.*" (Italics supplied.)

Beard v. Federy, 3 Wall. (70 U.S.) 478, 492, 493, 18 L.Ed. 88.

To the same effect, More v. Steinbach, 127 U.S. 70, 83, 8 S.Ct. 1067, 32 L.Ed. 51; Knight v. United Land Ass'n, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974.

In all three of these cases, one of the parties relied on the record of the proceedings before the Land Commission, with a decree actually *in favor of* the Mexican claimant. In none of these cases, nor in any of the many cited by the government, was there any contention raised that, in the proceedings embodied in the record, the government had an interest in maintaining the position of the opposing Mexican claimant, and hence had not conducted a true adversary defense. *In none was the decree drawn, as it was here, with findings and conclusions aimed to make it final against the government's cestui que trust.*

That is to say, in none was the court taking cognizance of such *equitable* "interest of third persons," as emerged in this case upon the confession of the government that it had bought its adversary title and then failed to defend its pretendedly opposed claim, and thereby connived at and

procured a decree which was consciously drawn to destroy the "third person" right.

Beard v. Federy, supra, 3 Wall. 478, 492, 18 L.Ed. 88, speaks of the effect of the record only where it *confirms* some Mexican claim of title. It holds no more than that. So far as such a Mexican confirmation is concerned, "As *against* the *government* this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming *under* the government by title subsequent."

Here, however, the question is whether the "record" "is conclusive" *in favor* of the government and against the parties claiming under the government by title acquired from the government *prior* to the record. In that regard the California claim is clearly within the Beard v. Federy definition of a "superior title" such as could "resist successfully any action of the government in disposing of the property" for a Naval Reserve.

It must be remembered that the government's bill confesses the acquisition of the alleged Mexican title from Bissell and Aspinwall on January 4, 1853 (Tr. 8), that is before any step in the trial was taken. The decree in the "record," which the government claims section 15 makes conclusive against California and its successors in interest, finds this acquisition of title from the claimant by the supposed adversary government, whereby the adversary character of the proceeding ceases. It then finds, in effect, that since California's successors in interest are "claiming by, under, and through" the government, they are parties *in* the action because they "are chargeable with notice thereof." The decree then holds, "therefore, that no` rights of third persons have intervened or could intervene."

This extraordinary portion of the record which the government claims is made conclusive against the appellants by section 15 of the Land Commission Act is repeated:

"And it further appearing, that all the right, title and interest of the Appellees herein in and to the said claim, have passed to and have been acquired by the United States, the Appellant herein, by purchase from the said Appellees [Jan. 4, *1853*] and that all persons claiming by, under, or through the Appellants or the Appellees or any of them, are `chargeable with notice of this action and of everything that has been done therein, and' therefore, that

no rights of third persons have intervened or could intervene.

"Now, therefore, on motion of Geo. J. Hatfield, Esq., United States Attorney for the Northern District of California, Attorney for said Appellant, made on the 15th day of April, 1930, that a decree be entered Nunc Pro tunc in conformity with the said Order and the Court now being fully advised in the premises, the said Motion is hereby granted and it is hereby ordered that this decree of confirmation in said cause confirming in all particulars the decision of said Board of Land Commissioners be entered Nunc Pro Tunc, as of the 2nd day of March, in the year *1857*. [Italics supplied.]

"Dated in open Court this 15th day of April, 1930."

(Tr. 290, 291.)

The language of section 15 on which the government claims the decree is conclusive against the State of California, is plainly contra to this contention. The conclusiveness is confined to the government and Mexican claimant by the use of the word "only." The language of section 15 is, "That * * * final decrees * * * shall be conclusive between the United States and the said claimants *only*." (Italics supplied.) This language clearly excludes the decree's conclusiveness as to claims between the government and California. There is nothing in Beard v. Federy, supra, or subsequent cases relying on it, which purports to decide anything on the controversy between the California interest and the government, presented in the instant case.

We hold the government's contention cannot prevail. The decree it relies on is not made conclusive by section 15 of the act as against California and its successors, and, in this proceeding in equity, California had and its successors have "the interest of third person" not parties but alien to the record in which the decree appears.

**V. (c) The suit in the District Court rendering the decree relied upon, and the prior proceeding before the Land Board, require the adjudication of the validity of Mexican claims of title with all the elements of judicial functions.**

Even if the claimants of the California title had been permitted to sue the United States at law in ejectment, they would maintain their patent title as against the decree in the Land Board proceedings,

since that was a one-party nonadversary action in which the Commissioners and District Court had no issue before them, and hence jurisdiction of nothing for their adjudication.

Since the action of Bissell and Aspinwall v. the United States ceased and determined in January, 1853, when, before testimony taken, the United States acquired their claim, there has been nothing sub-judice since that date which would prevent the issue of a patent to California.

All the authorities are agreed that the provisions of the Treaty of Guadalupe Hidalgo, providing for the recognition of Mexican titles and interests, are not self-executing. The treaty imposes merely a political obligation, and it was necessary that its provisions should be implemented by congressional action. Beard v. Federy, 3 Wall. 478, 491, 18 L.Ed. 88; Knight v. United Land Ass'n, 142 U.S. 161, 184, 186, 188, 12 S.Ct. 258, 35 L.Ed. 974; Foster v. Neilson, 2 Pet. 253, 314, 315, 7 L.Ed. 415; Barker v. Harvey, 181 U.S. 481, 486, 487, 21 S.Ct. 690, 45 L.Ed. 963.

This the Congress could have done by various legislative provisions. Among others, it could have provided that in all the federal and state tribunals in which the land was situated, the Mexican claimant could commence an action quasi in rem against all persons claiming adverse interest, in which the United States and any other adverse claimant might or might not appear as it was advised. There are many examples of this form of action. See Johnson v. North Star Lumber Co. (C.C.A.9) 206 F. 624, 628; Ennis-Brown v. Central Pacific Ry. Co. (C.C.A.9) 235 F. 825.

Obviously had such a form of action been created the statute would not contain the provision that the decree rendered "shall not affect the interests of third persons." There would be no third persons.

Instead, however, the United States created the Board of Land Commissioners, in which the claimant of the Mexican title would be the sole party, in a plaintiff capacity, and the United States should be, as against each claimant, the adverse defendant. From this Board decision either party could appeal to the District Court, where the issue was tried de novo.

This adversary character appears from the following provisions of the Act of 1851 creating the Board of Land Commissioners. Section 4 (9 Stat. 631) provides for the law agent of the United States to attend the meetings of the Board and gather the testimony "in behalf of the United States," and attend the taking of all depositions, notice of which must be given to him or to the United States district attorney. Similar notice must be given by the United States to the claimant of the Mexican title.

Section 8 provided that: " * * * it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim." 9 Stat. 632.

By section 9 the unsuccessful party may seek review of the decree of the Board in the District Court. Here service was required upon the successful adversary, who was "bound to answer" as in any other adversary action. Thereupon the "case shall stand for trial," not only upon the evidence before the Board but upon other evidence offered; that is, a trial de novo. By section 10 appeal was allowed to the Supreme Court by the "party against whom judgment is rendered." 9 Stat. 633.

These provisions show that the duty of the Board to "ascertain and settle" the validity of the Mexican claim was to ascertain and settle it as between the two adverse parties. Of course, the United States, as defendant, could admit the validity of the claim, either by an express statement in the record or, as with the case of any defendant, by failing to appear and oppose after service of notice of the pendency of the action; but this no more removes its adversary character than such admission in a common-law action makes a common law action nonadversary.

That the action before the Land Board and the District and Supreme Courts is truly judicial in character has been repeatedly held by the Supreme Court: "Nor can it be said that there is anything unjust or oppressive in requiring the owner of a valid claim, in that vast wilderness of lands unclaimed and unjustly claimed, to present his demand to a tribunal *possessing all the elements of judicial functions, with a guaranty of judicial proceedings,* so that his title could be established if it was found to be valid, or rejected if it was invalid." (Italics supplied.) Botiller v. Dominguez (1889) 130 U.S. 238, 250, 9 S.Ct. 525, 528, 32 L.Ed. 926. See, also, Grisar v. McDowell, 6 Wall. (73 U.S.) 363, 374, 18 L.Ed.

863; Beard v. Federy (1865) 3 Wall. (70 U.S.) 478, 480, 18 L.Ed. 88; U. S. v. Throckmorton (1878) 98 U.S. 61, 64, 25 L. Ed. 93; Boyle v. Hinds (1874) 3 Fed.Cas. p. 1111, No. 1759.

 The Supreme Court early held, in a case at law, that in an action in which the real party in interest is both plaintiff and defendant where there is no issue presented of which the court can take jurisdiction, any purported decree on judgment or other action taken in such a pretended suit, if not totally null and void, is at least not binding upon anyone not appearing. The invalidity is at law, and does not rest on the creation of any equitable obligation in the person claiming the benefit of the judgment. The leading case is Lord v. Veazie (1850) 8 How. 251, 256, 12 L.Ed. 1067, in which the pertinent facts are found in the order dismissing the writ of error, as follows: "Order. This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maine, and was argued by counsel, and it appearing to the court here, *from the affidavit and other evidence filed in the case by Mr. Moor, in behalf of* third persons *not parties to this suit,* that there is *no real dispute between the plaintiff and defendant in this suit, but, on the contrary, that their interest is one and the same,* and is *adverse to the interests of the persons aforesaid,* it is the opinion of this court, that *the judgment of the Circuit Court entered pro forma in this case is a nullity and void,* and that no writ of error will lie upon it. On consideration whereof, it is now here ordered and adjudged by this court, that the writ of error be, and the same is hereby, dismissed, each party paying his own costs, and that this cause be, and the same is hereby, remanded to the said court, to be dealt with as law and justice may require." (Italics supplied.)

The reasoning of the opinion is (8 How. 251, 255, 256, 12 L.Ed. 1067):

"It is the office of courts of justice to decide the rights of persons and of property, when the persons interested cannot adjust them by agreement between themselves,—and to do this upon the full hearing of both parties. And any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehended, and treated as a punishable contempt of court.

"The suit is spoken of, in the affidavits filed in support of it, as an amicable action, and the proceeding defended on that ground. But an amicable action, in the sense in which these words are used in courts of justice, presupposes that there is a real dispute between the parties concerning some matter of right. And in a case of that kind it sometimes happens, that, for the purpose of obtaining a decision of the controversy, without incurring needless expense and trouble, they agree to conduct the suit in an amicable manner, that is to say, that they will not embarrass each other with unnecessary forms or technicalities, and will mutually admit facts which they know to be true, and without requiring proof, and will bring the point in dispute before the court for decision, without subjecting each other to unnecessary expense or delay. *But there must be an actual controversy, and adverse interests.* The amity consists in the manner in which it is brought to issue before the court. And such amicable actions, so far from being objects of censure, are always approved and encouraged, because they facilitate greatly the administration of justice between the parties. *The objection in the case before us is, not that the proceedings were amicable, but that there is no real conflict of interest between them; that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be.*

"A judgment entered under such circumstances, and for such purposes, is a mere form. The whole proceeding was in contempt of the court, and *highly reprehensible,* and the learned district judge, who was then holding the Circuit Court, undoubtedly suffered the judgment *pro forma* to be entered under the impression that there was in fact a controversy between the plaintiff and defendant, and that they were proceeding to obtain a decision upon a disputed question of law, in which they had adverse interests. *A judgment in form, thus procured, in the eye of the law is no judgment of the court. It is a nullity, and no writ of error will lie upon it.* This writ is, therefore, dismissed." (Italics supplied.)

Concerning the violation of professional ethics involved in so imposing on the court, the Supreme Court justifies the position of Attorney General Cushing in refusing to continue the prosecution of the Bissell and Aspinwall case before the Board (8 How. 251, 254, 12 L.Ed. 1067) : "It is proper to say that the counsel who argued here the motion to dismiss, in behalf of the parties to the suit, stand entirely acquitted of any participation in the purposes for which these proceedings were instituted; and indeed could have had none, as they were not counsel in the Circuit Court, and had no concern with the case until after it came before this court. And we are bound to presume that the counsel who conducted the case in the court below were equally uninformed of the design and object of these parties; *and that they would not knowingly have represented to the court that a feigned controversy was a real one.*" (Italics supplied.)

A case which, if anything, is even stronger upon its facts is Cleveland v. Chamberlain (1862) 1 Black, 419, 17 L. Ed. 93. There the proceeding was in fact adversary throughout the trial in the lower court and until after judgment was rendered against Chamberlain. Pending appeal, Chamberlain acquired the interest of Cleveland and sought to continue the litigation for the purpose of adversely affecting the rights of those who were not parties. The Supreme Court held that the rule of Lord v. Veazie, supra, was entirely applicable, saying (1 Black, 419, at page 425, 17 L.Ed. 93) :

"This appeal must be dismissed. Selah Chamberlain is, in fact, both appellant and appellee. By the intervention of a friend he has purchased the debt demanded by Cleveland in his bill, and now carries on a pretended controversy by counsel, chosen and paid by himself, and on a record selected by them, for the evident purpose of obtaining a decision injurious to the rights and interests of third parties.

"*There is no material difference between this case and that of Lord v. Veazie,* (8 How. [251] 254 [12 L.Ed. 1067]), when the whole proceeding was justly rebuked by the court as 'in contempt of the court, and highly reprehensible.' That case originated in a collusion between the parties. In this case the appellee, who was a judgment-creditor of the La Crosse and Milwaukee railroad, filed his bill to set aside a fraudulent conveyance of the debtors' property made to the appellant, and other fraudulent conveyances of their lands made to certain directors of the company, who were also made parties respondent. The case was prosecuted with vigor by the complainant till a decree was obtained, (on the 11th of February, 1859) setting aside the various assignments, and the case 'committed to a master to ascertain and report the annual income of the several lots described in the bill,' &c. This was not a final decree. Nevertheless, an appeal was permitted to be entered by Chamberlain on 12th of February, 1859. But the record was not brought up to this court for a year and a half, nor so long as there were parties litigant who had adverse interests. About a month after the decree was entered, Chamberlain became the equitable owner of Cleveland's judgment, and the 'dominus litis' on both sides. He then agreed to pay counsel who appeared for Cleveland, the appellee, but, for anything that appears, without the knowledge of the counsel, who, in July, 1860, entered a discontinuance as to the parties, against whom a decree had not been entered.

"*It is plain that this is no adversary proceeding, no controversy between the appellant and the nominal appellee.* It differs from the case just cited in this alone, that *there* both parties colluded to get up an agreed case for the opinion of this court; *here,* Chamberlain becomes the sole party in interest on both sides, makes up a record, and has a case made to suit himself, in order that he may obtain an opinion of this court, affecting the rights and interest of persons not parties to the pretended controversy.

"We repeat, therefore, what was said by the court in that case: 'Any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law, which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehended, and treated as a punishable contempt of court.'" (Italics supplied.)

To the same effect and applying the same principles are South Spring Hill Gold M. Co. v. Amador Medean Gold M. Co. (1892) 145 U.S. 300, 12 S.Ct. 921, 36 L. Ed. 712; Weaver v. Kelly (C.C.A.5 1899) 92 F. 417; The W. Talbot Dodge (D.C. 1926) 15 F.(2d) 459; Cochrane v. Deener

(1877) 95 U.S. 355, 356, 24 L.Ed. 514; American Wood Paper Co. v. Heft (1869) 8 Wall. (75 U.S.) .333, 336, 19 L.Ed. 379; Muskrat v. U. S. (1911) 219 U.S. 346, 361, 31 S.Ct. 250, 55 L.Ed. 246; Northern Pac. Ry. Co. v. Boyd (1913) 228 U.S. 482, 505, 506, 33 S.Ct. 554, 57 L.Ed. 931; McArthur v. Scott (1885) 113 U.S. 340, 404, 5 S.Ct. 652, 28 L.Ed. 1015; People ·ex rel. Oliver v. Knopf (1902) 198 Ill. 340, 64 N.E. 842, 848, 1127; Board of Supervisors of Simpson County v. Buckley, 85 Miss. 713, 38 So. 104, 106, 107; Northern Pac. Ry. Co. v. Snohomish County, 101 Wash. 686, 172 P. 878, 879, 880.

We hold that the motion to strike from the evidence the judgment and record in the Bissell and Aspinwall case should have been granted, because, as soon as the Castro title was acquired by the United States, that case presented no issue of an adversary character upon which the District Court or the Land Board could take jurisdiction.

The principle of these cases answers the government's contention that the patents should be canceled because the Castro claim was *subjudice* during all the seventy-three years the government refrained to take, in the Bissell and Aspinwall action, a judgment, apparently against itself, but really in its favor. Since the government seriously urges this proposition in addition to all its other actions and contentions of ethical significance, in its attempt to keep its Naval Station lands from the appellants, it may be remarked that it has shown restraint in not waiting for, say, another century, in entering the Bissell and Aspinwall judgment.

We further hold that, since there was no such action pending, there was nothing there subjudice, and hence nothing there to prevent the issue of the patents.

VI. The Treaty of Guadalupe Hidalgo did not reserve lands not granted by the Mexican government, because Bissell and Aspinwall claimed Castro had received a grant, of which there is no evidence whatsoever. There was no withdrawal of such or any unknown claims to lands in New Mexico and California until Congress created tribunals for their determination.

The government contends that, because Bissell and Aspinwall asserted claim to a nonexistent grant of the lands by the Mexican Government, which the United States attorney in Bouldin v. Phelps, supra, established was executed after the Treaty of Guadalupe Hidalgo, they must be deemed withdrawn by that treaty. It will be remembered that, even assuming the evidence in the Bissell record as competent against California, under the decisions of the Supreme Court Castro had no title at all; so the question is one entirely apart from the effect of the treaty as withdrawing inchoate titles perfectable before American tribunals.

The government does not cite a case, from the score or more Mexican grant cases decided by the Supreme Court, which holds that there is such a treaty withdrawal of *any* lands, much less of lands to which no title whatever is granted. On the contrary, there are two cases squarely holding against the contention, and many others where such a withdrawal by that treaty would have made unnecessary the extended discussion concerning the existence and effect of a withdrawal by congressional legislation subsequent to the treaty.

The two holdings that the treaty did not constitute such a withdrawal are Lockhart v. Johnson, 181 U.S. 516, 21 S.Ct. 665, 45 L.Ed. 979, and Lane v. Watts, 235 U.S. 17, 22, 35 S.Ct. 3, 59 L.Ed. 104. Among cases failing to recognize such a treaty withdrawal, and treating the lands only as later withdrawn when sub judice under proceedings provided by statutes enacted after the treaty, are Newhall v. Sanger, 92 U.S. 761, 23 L.Ed. 769; Cameron v. U. S., 148 U.S. 301, ·13 S.Ct. 595, 37 L.Ed. 459, and Southern Pacific R. Co. v. U. S., 200 U.S. 354, 26 S.Ct. 298, 50 L.Ed. 512.

Beside California, the lands ceded by the treaty included those constituting the Territory of New Mexico. It is apparent that the parties signing the treaty at Guadalupe Hidalgo in 1848 did not look forward to no treaty withdrawal of claimed lands in New Mexico and a withdrawal by the same treaty of the lands in California.

To facilitate the determination of the Mexican claims to lands in these two areas, Congress, in 1851, created the Land Board to consider the California claims, and in 1854 gave similar powers to the Surveyor General for the Territory of New Mexico. While these tribunals had before them claims to these lands, they were deemed reserved from entry for the period that they were sub judice. The question of their status as public lands, subject to disposition as such, prior to the acts creating the functions of the Land Board and the Surveyor

General, and subsequent to their rejection of claims, was before the Supreme Court in the first two cases. Their status, while sub judice, was before these tribunals in the last three.

In Lockhart v. Johnson, supra, a Mexican title to lands in New Mexico was sub judice before the Surveyor and hence withdrawn from entry by the terms of the act of 1854 (10 Stat. 308). The Supreme Court, after construing an amendment to the act, made on March 3, 1891 (26 Stat. 854), held that the lands were no longer withdrawn from entry by any act of Congress. A mining claim was then made which was within the claimed limits of the grant but thereafter found to be outside. It will be noted that, unlike the Castro claim, here was a valid Mexican grant. Its unsurveyed boundaries were not then determined.

The court held the lands open to entry and sale under the laws of the United States, though within the claimed limits of the Mexican grant, unless such lands were *"reserved from entry and sale or other disposition by the United States, by reason of the provisions of the treaty with Mexico."* 181 U.S. 516, 521, 21 S.Ct. 665, 45 L.Ed. 979. In deciding that there was no such reservation of the ceded lands by the treaty, the Supreme Court held:

"We see nothing in the terms of that treaty, either in the 8th or 9th article, that could be construed as a withdrawal of lands which in fact were the public lands of the United States, although contained within the claimed limits of some Mexican grant made prior to the cession to the United States. *The mere fact that lands were claimed under a Mexican grant, when such grant did not in truth cover them, would not by virtue of any language used in the treaty operate to reserve such lands from entry and sale.* * * *

"The lands were in fact, and have been since their cession to this country, public lands of the United States, although during the period between the passage of the act of 1854 and that of 1891 they were not open for sale or other disposition while the claims to such lands were undetermined. * * *

"Public lands belonging to the United States, for whose sale or other disposition Congress has made provision by its general laws, are to be regarded as legally open for entry and sale under such laws, unless some particular lands have been withdrawn from sale by congressional authority or by an executive withdrawal under such authority, either expressed or implied. Wolsey v. Chapman, 101 U.S. 755, 769, 25 L.Ed. 915, 920; Hewitt v. Schultz, 180 U.S. 139, 21 S.Ct. 309, 45 L.Ed. 463. * * *

"Nor does the case of Newhall v. Sanger, 92 U.S. 761, 23 L.Ed. 769, apply. In that case it was held, that lands within the boundaries of an alleged Mexican or Spanish grant which was subjudice at the time the Secretary of the Interior ordered a withdrawal of lands along the route of the railroad, were not embraced in the congressional grant to the company. The decision went upon the ground that *the legislation of Congress* had been so shaped that no title could be initiated under the laws of the United States to lands covered by a Spanish or Mexican claim until it was barred by lapse of time or rejected. The act of *March 3, 1851* (9 Stat. at L. 631, 633, c. 41, § 13), which provides for the presentation of claims under Mexican grants in California to the commission established by the act, was referred to by the court, and it was held that by reason of *its* provisions the lands were not public lands under the laws of the United States until the claims thereto had been either barred by lapse of time or rejected. The 6th section of the *act of 1853,* March 3 (10 Stat. at L. 244, 246, c. 145), was also referred to as *expressly excepting* all lands claimed under any foreign grant or title." (Italics supplied.) Lockhart v. Johnson, 181 U.S. 516, 520, 521, 522, 525, 526, 21 S.Ct. 665, 667, 45 L.Ed. 979.

In Lane v. Watts the court repeats the holding of Lockhart v. Johnson: "The mere fact of a claimed Mexican grant did not reserve the lands covered by it. Lockhart v. Johnson, supra. It was only after their presentation to the surveyor general of New Mexico for his report thereon that the lands were reserved 'until the final action of Congress.' *There was no reservation except by this statute,* and it related only to lands covered by a claim presented to the surveyor general. *There is no language in the treaties which implies a reservation.* Lockhart v. Johnson, [181 U.S. 516 at page 523, 21 S.Ct. 665, 45 L.Ed. 979." (Italics supplied.) Lane v. Watts, 235 U.S. 17, 22, 35 S.Ct. 3, 5, 59 L.Ed. 104.

The cases of Cameron v. U. S., Newhall v. Sanger, and Southern Pac. R. Co. v. U. S., all would have avoided pages of discussion in holding they were withdrawn by

congressional act, if the mere treaty had constituted the withdrawal.

In Cameron v. U. S. the land was in fact sub judice, the Mexican title being then in question before the Congress, the Surveyor General having reported the Mexican title to Congress, and the Congress failing to act upon it at the time it was claimed to be public land of the United States. The opinion holds that: "In this case there is an express finding that the report of the surveyor general, limiting the grant to four square leagues, has never been finally acted upon by congress, and that the claim and report *are still pending before congress;* in other words, *that the claim is sub judice.*" (Italics supplied.) Cameron v. U. S., 148 U.S. 301, 310, 311, 13 S.Ct. 595, 599, 37 L.Ed. 459.

In Newhall v. Sanger, supra, a claim to certain land under a Mexican grant was still sub judice under the proceedings of the act of March 3, 1851, when Congress purported to grant the same lands to the Western Pacific Railway. Instead of relying upon a reservation arising from the Treaty of Guadalupe Hidalgo and extending until an adjudication of Mexican claims, it bases its decision on the congressional withdrawal by the act of March 3, 1851: "It is unnecessary to dwell longer upon this question, or to review subsequent statutes touching the government lands in California. It suffices to say, that there is nothing in any of them which weakens the construction we have given to the act of *1851*. This controversy depends upon *that act* and the Pacific Railroad acts which we have cited." (Italics supplied.) Newhall v. Sanger, 92 U.S. 761, 765, 23 L. Ed. 769.

We can see nothing in the dicta in Quinn v. Chapman, 111 U.S. 445, 446, 4 S.Ct. 508, 28 L.Ed. 476, and United States v. McLaughlin, 127 U.S. 428, 454, 8 S.Ct. 1177, 32 L.Ed. 213, which interprets differently Newhall v. Sanger. Certainly no theory of withdrawal by treaty was then recognized by the Supreme Court. If such a doctrine had been established, it would have been applied in Cameron v. U. S., decided 7 years later, and in the several subsequent cases relying only on the withdrawal while sub judice in proceedings under statutes.

Eight years later, Lockhart v. Johnson so interprets Newhall v. Sanger as relying solely on withdrawal by the subsequent statute and not by treaty.

In Southern Pacific R. Co. v. U. S., 200 U.S. 354, 357, 26 S.Ct. 298, 300, 50 L.Ed. 512, instead of holding the lands claimed under the Mexican grant were withdrawn by the treaty, the Supreme Court opens its opinion with the sentence, "The single question is whether these lands were, between the dates of the two surveys, *sub judice,* and therefore not passing under the grant to the railroad company." The Mexican grant had been held valid, but the survey provided by the Land Board Act had not yet determined the area. The grant to the railroad was made prior to the survey of the Mexican claim. The court held the land was withdrawn because sub judice. It does not mention the treaty, much less that *it* withdrew the lands and thus overrule the Lockhart v. Johnson decision, decided five years previously, and differ from the subsequent decision of Lane v. Watts.

We therefore hold that the Treaty of Guadalupe Hidalgo did not withdraw the lands on the invalid claim of Castro, and that in 1850 they were subject to the disposition of Congress by the swamp and overflow grant.

There is a serious practical objection to an overruling of Lockhart v. Johnson and Lane v. Watts. The principal occupation of Californians at the time of the cession was the grazing of livestock. In the north central, central, and southern parts of the state there is no summer rainfall or green pasture on their uplands. The swampy lands with their green summer feed are principally located in the great central basin in the Delta and lower reaches of the Sacramento and San Joaquin rivers, and the borders of San Francisco, San Pablo, and Suisun Bays. They are filled by the late spring freshets from the Sierra snows or by the brackish backwaters of the bays. Naturally, the cattle raisers seeking Mexican grants desired to have them included with the summer dry upland. The Supreme Court in Wright v. Roseberry, supra, estimates the area of California swamp and overflowed land at 2,000,000 acres. Of the claimed Mexican titles presented to the Land Board 190 were rejected, covering approximately 3,-000,000 acres. Morrow's Spanish and Mexican Private Land Grants, p. 14.

Obviously among these rejected titles was a very large area of swamp and overflowed lands which have since been acquired in private ownership from Califor-

nia. There has been no grant to the state except in the Swamp and Overflow Act of 1850. While claims held invalid by the Land Board are declared in section 13 of the act of 1851 (9 Stat. 633) to be deemed "part of the public domain of the United States," this does mean that they were public lands in 1850 when the swamp land grant was made. If, as now claimed, they were withdrawn then by the treaty, they were not restored to California by their rejection by the Land Board. The 1850 grant being *in præsenti* could not grant lands restored to the public domain.

In 1857, when a large part of the Mexican claims to California lands were still sub judice and very little of the California swamp lands had been reported to the General Land Office, Congress enacted that swamp lands selected and reported to the Land Office prior to March 3, 1857, were then confirmed. The act applied to all the states, not particularly to California. This is the only congressional confirmation of the grant of 1850.

In 1866 the question of swamp land titles in California had become more acute. Congress passed an act, 43 U.S.C.A. § 987, ordering a certification to California of all lands in approved township plats. The determination of what lands should be on such approved township surveys should be based on a report of a survey of which land was swamp and overflowed "under the grant" of 1850. If the treaty reserved the vast body of land invalid but claimed Mexican grants, it was not "under the grant" which could convey to California only public lands not so reserved.

If we were to hold that the Treaty of Guadalupe Hidalgo caused a withdrawal of all claimed but invalid titles and that they were not conveyed to the State of California, the title to them is unsettled. It is not for us to suggest what would be the status of such swamp lands if excepted from the 1850 grant to California by a treaty withdrawal such as claimed by the government. We merely point out the possible serious results in unsettling titles if the government's contention is maintained.

Appellee's prayer for the cancellation of the patents to the State of California is denied.

In response to appellants' prayer that their title be quieted against the United States, we hold that the United States has no title to the patented lands and that the title is in and quieted in appellants.

Reversed.

HANEY, Circuit Judge (dissenting).

The decision in this case is important, not for the mere fact that the government has expended $2,000,000 on improvements on the land in question, but because under the doctrine of the majority opinion, none of the hundreds of Mexican grants in California are immune to attack. As the statement of facts is somewhat scattered throughout the majority opinion, I restate them for a better understanding of the case.

## I. Statement of Facts.
### (a) The Land in Question.

The land in controversy was at one time designated as "swamp and overflow Land Survey No. 34." There is involved a question as to whether or not the land is a part of Mare Island; if it is not, it is very close to the island, being depicted on most maps as a part thereof. The southern part of the island is used by the government as a navy yard. The northern part of the island obtained by certain claimants in San Francisco Sav. Union v. Irwin (C.C.Cal.) 28 F. 708, affirmed 136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540, was known as "Swamp and Overflow Land Survey No. 569." The southern boundary of No. 569 is the northern boundary of the land in controversy, and the southern boundary of this latter tract is about one mile south of the northern boundary. The area of the tract in question originally was 164.55 acres, but, because of accretions, consists now of about 500 acres.

The western boundary of the tract is San Pablo Bay, and the eastern boundary is the Napa river. The island, including the tract involved herein, lies nearly in direction from northwest to southeast.

### (b) History of Appellants' Claims.

By the Act of September 9, 1850, c. 50 (9 Stat. 452), California was admitted as one of the United States.

The Act of September 28, 1850, c. 84 (9 Stat. 519), provided that "the whole of those *swamp* and *overflowed* lands, made *unfit* thereby *for cultivation,* which shall remain *unsold* at the passage of this act, shall be, and the same are hereby, granted to said State" of Arkansas. Section 1. Another provision of the act provided:

"That the provisions of this act be extended to, and their benefits be conferred upon, each of the other States in the Union in which such swamp and overflowed lands, known as designated as aforesaid, may be situated." (Italics supplied.) Section 4.

On June 11 and 12, 1855, one Patton, then county surveyor for Solano county, Cal., made a survey of the land in controversy, as "swamp or tule" land, for one David N. Darlington. On October 10, 1856, a survey was made "for David N. Darlington, by David P. Wade County Surveyor of Solano County through Em. A. d'Hemecourt deputy."

The survey covered the land in question and was called "Survey No. 34," and in this survey it was said: "The whole being swamp and overflowed land to the full intent and meaning of an act of the legislature of this state entitled an act to provide for the disposal of the Swamp and overflowed land belonging to this State, passed April 28th 1855, and surveyed in accordance with the provisions of said act and the directions of the Surveyor General of the State of California."

On March 18, 1857, the State of California issued a patent to the land in question to Darlington.

The Act of July 23, 1866, c. 219 (14 Stat. 218, 219), provided that "it shall be the duty of the commissioner of the general land office to certify over to the State of California, as swamp and overflowed, all the lands represented as such" (section 4 [see 43 U.S.C.A. § 987]) on approved plats of township surveys made under authority of the United States.

The State of California, by an act of its Legislature approved March 27, 1872 (St. 1871–72, p. 622), with respect to patents theretofore issued by it, conveyed "all its right, title and interest in and to the lands in such patents described."

One E. H. Sawyer brought an action of ejectment against the then commandant of the Navy Yard at Mare Island and another, to recover possession of the land involved herein. Judgment was rendered for defendants because the court held that it was necessary for plaintiff to prove a legal title in himself, and, as he had not shown a patent from the United States to the State of California, the legal title still remained in the United States. Sawyer v. Osterhaus (D.C.Cal.) 212 F. 765, decided February 7, 1914. In that opinion, at page 775 of 212 F., it is said "that the lands in suit were at the date in question, and continued to be down to a period long after their survey for plaintiff's predecessors, strictly within the definition of tide lands, as distinguished from swamp lands."

A letter dated September 16, 1914, from the Commissioner of the General Land Office to Register and Receiver at San Francisco, states that the State of California by its State Surveyor General applied for the certification to it of the land in question as "swamp and overflowed" lands on July 29, 1912. The Commissioner by this letter rejected the application for two reasons:

. "1. No segregation survey of said swamp and overflowed lands, showing their location and area, has been approved.

"2. If they be on Mare Island, that was in private ownership under a Mexican grant since May 20, 1841, and so was not subject to the grant made by the Act of September 28, 1850 (9 Stat. 519)."

The United States Surveyor General for California on January 6, 1915, instructed one W. J. Lightfoot, United States Surveyor, to examine and investigate certain alleged swamp lands, and his report referred to the land in question as "swamp and overflowed." Similar instructions were given to one Francis E. Joy on January 27, 1921, to make a report on "Lands Properly Belonging To Mare Island." His report was submitted on October 23, 1922, wherein it was said: "The results of my investigations and observations * * * lead me to believe that there is no doubt that water at extra high tides * * * crossed over [the questioned tract] and probably at ordinary high tides with a stiff wind from the southwest, but that the water crossed over the shore * * * more in the manner of an overflow, a broad sheet or spillway, without any definite channel, and only in one direction to the northeast. * * *"

In 1924, the United States, in the Supreme Court of the District of Columbia, on the relation of one of the appellees herein, filed a petition to obtain a writ of mandamus against the Secretary of the Interior requiring the latter to determine whether or not the land in question was swamp and overflowed land. A writ was issued on May 29, 1924, and in response thereto the following decision by the Secretary was made on January 10, 1925: "From the evidence before me I am led to

the conclusion that the body or strip of land known as Survey No. 34, was at the date of the swamp-land grant of September 28, 1850, swamp in character. * * * Accordingly, it is hereby declared to be swamp land, and, as such, subject to patent to the State of California in the absence of other sufficient reasons."

Thereafter, the Secretary of Interior refused to certify the lands for patent to the State of California. On May 25, 1925, the same party in the action above outlined filed a petition for a writ requiring the Secretary to "certify said lands for patent to the State of California." The writ was granted on October 29, 1926, and the judgment was affirmed on appeal, Work v. U. S. ex rel. O'Donnell, 57 App.D.C. 309, 23 F.(2d) 136, 138, the court saying: "The mere issuance of patent to California determines no legal or equitable right of the United States in the premises."

The patent covering this land from the United States to the State of California is dated March 9, 1928.

The appellants deraign their title from Darlington.

### (c) History of Appellee's Claim.

The government claims title derived from a Mexican grant to one Castro.

The Congress of United Mexican States decreed on August 18, 1824, the colonization act. It provided:

"2d. The objects of this law are those national lands which are neither private property nor belonging to any corporation or pueblo, and can therefore be colonized.

"3d. To this end the Congress of the States will form, as soon as possible, the laws and regulations of colonization of their respective demarcation, with entire conformity to the constitutive act, the general constitution, and the rules established in this law.

"4th. Those territories comprised * * within ten leagues of the seacoast cannot be colonized without the previous approval of the supreme general executive power." Executive Document No. 17, p. 139, dated January 21, 1850; Reynolds, Spanish and Mexican Laws, 1895, p. 121.

On November 21, 1828, the rules and regulations for the colonization of territories were promulgated. Among them were:

"1st. The governors * * * of the territories are authorized * * * to grant vacant lands in their respective territories to such * * * private persons * * * who may ask for them, for the purpose of cultivating and inhabiting them.

"2d. Every person soliciting lands * * * shall address to the governor of the respective territory a petition, expressing his name [etc.] * * * describing as distinctly as possible, by means of a map, the land asked for * * *.

"4th. * * * The governor will accede or not to such petition, in exact conformity to the laws on the subject, and especially to the beforementioned one of the 18th of August, 1824.

"5th. The grants made to * * * private persons shall not be held to be definitely valid without the previous consent of the territorial deputation, to which end the respective documents * * * shall be forwarded to it.

"6th. When the governor shall not obtain the approbation of the territorial deputation, he shall report to the supreme government, forwarding the necessary documents for its decision. * * *

"8th. The definitive grant asked for being made, a document signed by the governor shall be given, to serve as a title to the party interested, wherein it must be stated that said grant is made in exact conformity with the provisions of the laws in virtue whereof possession shall be given.

"9th. The necessary record shall be kept, in a book destined for the purpose, of all the petitions presented, and grants made, with the maps of the land granted, and the circumstantial report shall be forwarded quarterly to the supreme government." Executive Document, supra, p. 141; Reynolds, supra, p. 141.

Jose Victor Castro, on October 30, 1840, petitioned the Governor of California for a grant of "an adjacent Island in the Bay of San Francisco, called 'Mare Island' which has no owners." The next day, the Governor ad interim granted permission to Castro "to occupy with horses the island called la Yegña in the Straits of Carquinez," which permission was also signed by the secretary ad interim. Subsequently Castro renewed his petition, and the following writing was made on the paper upon which the permission had been written.:

"Juan B. Alvarado, duly commissioned constitutional governor of the Department of the California.

"Whereas Dn. Victor Castro, a Mexican by birth, has petitioned this government for ownership of the island named la Yegu situated near the Carquinez Straits, in consequence whereof the foregoing license was given him by Dn. Manuel Ximeno Casarin in charge ad interim of this government, and by virtue of the fact that the petitioner has again repeated his petitions proving that said island does not belong to the ownership of any individual, pueblo nor corporation. I have by means of a decree of this date declared, as I now declare by these presents Dn. Victor Castro owner of the property of the said island in all its extent in conformity with the powers conferred upon me by the supreme national government.

"In consequence let this be delivered to the interested party in order that it may serve him as evidence of his title and for such other purpose as may be convenient.

"Given at Monterrey, Capital of the Department, on the 20th day of May, 1841.
"Juan B. Alvarado."

The Treaty of Guadalupe Hidalgo was proclaimed July 4, 1848 (9 Stat. 922). This treaty provided that the Mexican grants "preserve the legal value which they may possess, and the grantees may cause their legitimate [titles] to be acknowledged before the American tribunals." It was also provided: "Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories are those which were legitimate titles under the Mexican law in California * * * up to the 13th of May, 1846. * * *"

One Bissell and one Aspinwall became vested with the title to whatever interest Castro had acquired by the above-mentioned grant by mesne conveyances. By the Act of March 3, 1851, c. 41 (9 Stat. 631), a commission consisting of three commissioners was constituted "for the purpose of *ascertaining* and *settling* private land claims in the State of California." Section 1. (Italics supplied.) This act provided that any one claiming title to lands in California derived from a Spanish or Mexican grant must within 2 years present his claim to the commission which must render a decision on the validity of the claim. Section 9 provided for a review of such decision by the District Court, and section 10 provided for an appeal to the Supreme Court. With respect to all lands, the claims to which were not presented to the commission within the 2-year period, such lands were to be considered as a part of the public domain. A claimant, whose claim was finally confirmed, could receive a patent upon his presentation to the General Land Office of his certificate of confirmation" and a plat or survey of the said land, duly certified and approved by the surveyor-general of California, whose duty it shall be finally to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same."

By section 11 of the act it was provided: "That the commissioners herein provided for, and the District and Supreme Courts, in deciding on the validity of any claim brought before them under the provisions of this act, shall be governed by the treaty of Guadalupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable."

Section 15 provided that the final decrees rendered, or any patent issued, under the act "shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

The Act of August 31, 1852, c. 108 (10 Stat. 76), provided for an automatic appeal from the decision of the commissioners to the District Court in accordance with certain conditions therein specified.

On August 31, 1852, Bissell and Aspinwall presented their claim to the Land Commission.

Negotiations commenced on behalf of the government on July 23, 1852, to purchase Mare Island, culminated in the purchase from the assignees of Castro, of the island for $83,491.00 by deed dated January 4, 1853, pursuant to the authority contained in the Act of August 31, 1852, c. 109, § 3 (10 Stat. 100, 104).

The facts concerning this purchase are not disclosed in the proceedings before the commission. The first proceeding taken by the commission after the petition was presented and filed, occurred on April 20, 1854. Further proceedings were had thereafter, but the record in that proceeding discloses no evidence showing that the alleged grant was recorded in the Mexican archives. The case was submitted on briefs and taken un-

der advisement by the commission on November 7, 1854.

On May 8, 1855, the commission delivered an opinion stating in part:

"Strong suspicion has been raised by the testimony as to the genuineness of the grant * * *

" * * * from the facts before us we do not feel warranted in discrediting entirely the testimony of Governor Alvarado, and if any force is given to it, it must be for the full extent of his statements, and in that event, this claim must be confirmed and a decree herein will be entered accordingly."

On the same date a decree of confirmation was entered wherein it is said:

" * * * it is adjudged by the Commission that the claim of the said petitioners is valid, and it is therefore deemed that their application for a confirmation thereof be allowed.

"The place of which confirmation is hereby given is situate in the Bay of San Francisco and is called 'Isla de la Yegue' or Mare Island and being an Island is bounded by the water's edge."

On February 1, 1856, notice of appeal to the District Court was filed, and on March 2, 1857, the District Court entered its decree, which is unsigned, affirming the decision of the commissioners, that the grant "is a good and valid claim and that the said claim be and the same is hereby confirmed to the said 'Isla de la Yegua' or 'Mare Island' with its natural boundaries."

On April 1, 1857, a minute order allowing an appeal to the Supreme Court was made, and thereafter during that year (the day and month not being disclosed) the parties stipulated that such appeal be vacated "and that claimants have leave to proceed under the decree of this court heretofore rendered in their favor, as under Final Decree." A minute entry of an order of the District Court referring to the same matter uses language identical to that above quoted. Both minute orders are unsigned.

On April 15, 1930, a decree nunc pro tunc was entered in the District Court, stating, among other things "that the said claim be and the same is hereby confirmed to the said 'Isla De La Yegua' or 'Mare Island' with its natural boundaries."

(d) The Issues.

On November 24, 1930, appellee filed its bill alleging that a grant was made by the instrument hereinabove referred to; that the grant was confirmed by a decree of the Land Commission; that on petition for review, the lower court ordered judgment to be entered on March 2, 1857; that the decree of the lower court was entered on April 15, 1930; and that appellants are bound by the decree, because they claim under and in privity with appellee against whom the decree was rendered. The facts concerning the purchase of the land in question for $83,491 were alleged, as were the reservations, and the occupation of the lands in question by appellee since September 16, 1853.

The bill further alleged the issuance of the Darlington patent; that appellants claim some title and right to the land in question by virtue of mesne conveyances, and that "each of said claims is wholly without right or foundation in law or fact"; that appellee issued a patent to the State of California, but that the same "is null and void and is without force and effect and has no validity." Appellee prayed that the patent issued to the State of California, the patent issued by the latter to Darlington, and the mesne conveyances mentioned, be for cancellation; that appellants be adjudged void, and the same be surrendered judged to have no title or interest in the lands in question; and that appellee be adjudged to be the owner in fee simple absolute, and possessed of the lands in question.

Appellants answered alleging, generally, that the Castro grant was void, and never finally confirmed, and that appellee had no right, title, or interest in the land in question because the patent to the State of California, and the Darlington patents were valid.

The court decreed in favor of appellee, from which this appeal was taken.

(e) Questions Presented.

The mere fact that appellee issued a patent does not conclude an attack against it, for as said in Steel v. Smelting Co., 106 U.S. 447, 452, 1 S.Ct. 389, 394, 27 L.Ed. 226, that if the lands covered by the patent "never were the property of the United States, or if no legislation authorized their sale, or if they had been previously disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds at any time and in any form of action." The reason for such rule is found

50

in Davis' Administrator v. Weibbold, 139 U.S. 507, 509, 11 S.Ct. 628, 636, 35 L.Ed. 238, where it is said that such patents "are conclusive in such actions [referring to actions of the land department] of all matters of fact necessary to their issue, where the department had jurisdiction to act upon such matters, and to determine them; but if the lands patented were not at the time public property, having been previously disposed of, or no provision had been made for their sale or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the land, and their attempted conveyance by patent is inoperative and void, no matter with what seeming regularity the forms of law have been observed." And in United States v. Conway, 175 U.S. 60, 68, 20 S. Ct. 13, 16, 44 L.Ed. 72, it is said that "nothing is better settled by this court than that a patent issued by the United States to lands which they do not own is a simple nullity," citing cases.

In the light of the pleadings, then, it is apparent that our first inquiry is directed to the question as to whether or not the United States owned the lands in question at the time of the conveyance thereof to the state. We may assume that such conveyance occurred, if at all, at the time of the enactment of the Swamp Act, for if it did not own the lands at that time, the state acquired nothing. I believe this is conceded by both parties. The majority likewise agree, for it says that if the land was granted to Castro in 1841 "the United States did not acquire these lands from Mexica in the cession of area now constituting the State of California, and hence they were not granted to California by the Act of 1850."

In determining whether or not the lands in question were owned by appellee at the time of the enactment of the Swamp Act, it is alleged that the prior grant to Castro was confirmed by the Land Commission, and by the District Court. The answers, taken in connection with contentions of appellants, present three issues: (1) Was there a decree of confirmation actually entered? (2) If so, was it valid? (3) If so, is it binding on appellants?

## II. Confirmation of the Castro Grant.

### (a) Decree of Confirmation Was Entered.

It is conceded that the Commission entered and signed the decree mentioned. No reason appears why the rendition of the decree of the District Court on March 2, 1857, was not made, except that such decree was unsigned. I see no reason why that decree is invalid. I find neither statute nor decision which requires the judge to sign a decree in the federal court. 33 C.J. 1212, § 152; 15 R.C.L. 585, § 21; and see Secombe v. Steele, 20 How. (61 U.S.) 94, 102, 15 L.Ed. 833. Nothing in Equity Rule 3 (28 U.S.C.A. following section 723) requires it. The act creating the Land Commission says, in section 10, 9 Stat. 633, that "The District Court shall proceed to render judgment," but nothing requires the judgment to be signed. It therefore appears that the nunc pro tunc decree did nothing more than was already done.

However, since the parties have made no point of it, I do not need to rest the conclusion, that the Castro grant was in fact confirmed, on the point just mentioned, for the decree of the Commission is conclusive until vacated. Beard v. Federy, 3 Wall. (70 U.S.) 478, 492, 18 L.Ed. 88. Cf. Central National Bank v. Stevens, 169 U.S. 432, 459, 18 S.Ct. 403, 42 L.Ed. 807.

We must, therefore, accept the conclusion that the grant was in fact confirmed, under either theory mentioned.

### (b) Validity of the Decree of Confirmation.

*First.* It is not contended that the decree is void because the Commission did not have jurisdiction over the persons of the claimants, and the United States, and no such contention could be made, for the claimants and the United States submitted to the jurisdiction of the Commission and the District Court.

*Second.* Appellants originally contended that the decree was void because it was rendered on insufficient evidence, in that there was no evidence before the Commission that the Castro grant was recorded in the archives of Mexico, or for other reasons requiring proof by evidence. This contention is disposed of by the following quotation from Beard v. Federy, supra, 3 Wall. 478, 489, 18 L.Ed. 88: "The board having acquired jurisdiction, the validity of the claim presented, and whether it was entitled to confirmation, were matters for it to determine, and *its decision, however erroneous, cannot be collaterally assailed on the ground that it was rendered upon insufficient evidence.* The rule which applies to the judgments of other inferior tribunals applies here,—that when it has

once acquired jurisdiction its subsequent proceedings cannot be collaterally questioned for mere error or irregularity." Further, whether or not the grant was valid is a conclusion of law to be drawn from the facts. After the term, at which a judgment or decree was rendered, has expired, such judgment or decree, except on appeal therefrom, cannot be set aside upon the sole ground that it is erroneous as a matter of law. Bank of United States v. Moss, 6 How. (47 U.S.) 31, 12 L.Ed. 331.

On rehearing, appellants concede the correctness of that holding by saying: "We readily admit that, except upon direct appeal, a decree of confirmation may not be questioned because of any inadequacy of the evidence upon which it is based."

*Third.* Appellants also contended that upon purchase of the Bissell and Aspinwall claim prior to determination thereof by the Commission the controversy ended, and so none was pending when the Commission entered its decree.

There are two answers to that contention: The Commission had jurisdiction, after presentation of the claim, regardless of whether or not a controversy existed; and there was in fact a controversy.

The act (9 Stat. 631, § 1) creating the commission begins with the statement, "That for the purpose of ascertaining and settling private land claims in the State of California." The only purposes of the act were stated to be "ascertaining * * * private land claims" and "settling private land claims." Thus the jurisdiction of the Commission was extended to the problem of ascertaining what grants were in existence. Ascertaining what grants were in existence was important to the United States in regard to the newly acquired lands, as shown by More v. Steinbach, 127 U.S. 70, 81, 8 S.Ct. 1067, 32 L.Ed. 51, and Newhall v. Sanger, 92 U.S. 761, 763 et seq., 23 L.Ed. 769. It is obvious that grants could be *ascertained* without the existence of a controversy, and that, therefore, its jurisdiction did not depend on the existence of a controversy.

The majority now holds that the duty, thus stated "was to ascertain and settle it as between two adverse parties." It says that such a conclusion follows from certain provisions of the act. That the provisions do not state expressly that such is the fact, is shown by a perusal of them. That the provisions contain no such meaning by implication, is shown by the fact that they, on their face, relate to cases where there was *in fact* a controversy.

The second reason why the contention of appellants is unsound is that there was in fact a controversy. The officers of the United States were required to be present at all hearings before the commissioners. Even in the case of perfect grants, such officers had the duty to prevent encroachment on the public lands by claimants under their grants, or in other words, to see that the claimants did not claim more than actually belonged to them. Appellants on rehearing deny the application of that statement saying: "Surely it will not be contended that the United States had a controversy with itself to prevent its claiming as against itself more land than it was entitled to." From this, I understand that it is argued that officers of the United States may violate duties imposed by statute whenever their judgments so dictate. I do not understand that to be the law. The statute prescribes the duty as stated, and all the wisdom appellants may muster cannot controvert it. It is for Congress to prescribe the duty, not appellants. The presumption is that the officers performed their duty, and appellants have not overcome it.

A further reason why there was in fact a controversy is that even at the time of the decree of the land commissioners, the United States, under the theory of the majority that the land was conveyed to California, still held the legal title because no patent had been issued. Michigan Land & Lumber Co. v. Rust, 168 U.S. 589, 18 S.Ct. 208, 42 L.Ed. 591. Therefore there was a contest between the holder of the legal title against persons claiming it. It was exactly so held in Sawyer v. Osterhaus, supra, and the decree in that case is res judicata because appellants claim under the plaintiff in that case, and are in privity with him. Dowell v. Applegate, 152 U.S. 327, 343, 14 S.Ct. 611, 38 L.Ed. 463; Litchfield v. Goodnow, 123 U.S. 549, 550, 8 S. Ct. 210, 31 L.Ed. 199.

*Fourth.* The majority holds that appellee was trustee for California, at the time of the decree of the Commission, and that it violated its duties as trustee in haphazardly or perfunctorily contesting the Castro claim to the detriment of the cestui, and therefore appellee "can take no advantage from the proceeding before the Commission."

That argument is based on the assumption that actually the equitable title passed only if the land was *public* at the time the swamp act was passed. And to determine that question, one must first determine whether the decree of the Land Commission can be attacked, because if not, California received no interest whatever. The holding is analogous to the homely examples of the cart pulling the horse, and crossing the bridge before it is reached. Attaching the word "equity" to a court does not permit it to transmit power to the cart to pull the horse, nor does it permit the bridge to be crossed before it is reached.

The fallacy in the holding of the majority is that the grant is attacked without first considering whether or not the decree is subject to attack, and once having successfully attacked the grant, the result thereof is the establishment of an equitable title, which is then used as a basis for an attack upon the decree. But the existence of the equitable title arises from a successful attack on the decree. Such reasoning, in my opinion, has neither beginning nor end.

That is what I said in the original dissent, and it is now applicable. Appellants, on rehearing, erroneously state: "The dissenting opinion conceives that the majority opinion reasons in a circle, the argument in this connection being this: that the confirmation proceedings cannot be attacked, except by one having an equity in the property; that the majority assume that the United States held the legal title in trust for the State under the Swamp Land Act and that therefore the appellants, as successors in interest, may question the confirmation proceedings; whereas, so it is urged, until the confirmation proceedings are disposed of no equity in the State is shown which would give it, or appellants as its successors in interest, any standing to attack the proceedings." Nowhere did I state that "one having an equity in the property" could attack the confirmation proceedings. In fact, the statement is untrue. One might own an equity under a claimant before the Commission, but under section 15 of the act, he could not attack the confirmation proceedings.

The majority answer this argument by saying: " * * * Implicit in this bill, so recognizing the patents which it seeks to cancel, is the recognition of the status of the United States as holder of the bare legal title in 1850, at the time of the grant

to California, in trust for California as its cestui, having the whole equitable interest." Let us see what the bill recognizes. After alleging the issuance of the patent by appellee to appellants, it is alleged that such patent " * * * is null and void and is without force and effect and has no validity for the reason that the lands described in said purported patent were claimed and held in private ownership under and by virtue of the aforesaid grant from the Governor of Mexico at the time of the passage and approval of the above mentioned Swamp Land Act and were not a part and never had been a part of the public domain * * *" Several other reasons were alleged in the bill as grounds for the allegation that the patent was void. I am unable to agree with the majority holding with respect to this specific matter in view of such allegations.

Appellants on rehearing offer the following observation with respect to my conclusion that the majority reasoning was circuitous: "This line of argument, we respectfully suggest, wholly misconceives the position of appellants. They are not claiming that, because the Government held the legal title in trust for the State, they are free to attack the confirmation proceedings. *Appellants are not, in any true sense, attacking those proceedings at all.* Their claim is merely that those proceedings, be they good or bad, are not binding upon them * * *" (Italics supplied.)

These statements were either made erroneously, or appellants now wish to change the theory heretofore urged. Proof of my statement is found in appellants' briefs, where I find nearly 15 pages devoted to an attack upon the decree of confirmation. In their brief they say: "We submit, upon the grounds stated, that the decree of the Land Commission was, and is, void, and upon the same grounds the nunc pro tunc decree was and is void"; "We need not pause to inquire the effect on the Castro claim of the void decrees"; and in the Résumé: "It results, therefore, that on each of the grounds stated, the Land Board, and equally the District Court, was without jurisdiction or power to confirm the Castro grant, and being so without power or jurisdiction, the decrees respectively of the Land Board and the District Court, are nullities." A similar statement is made in appellant's reply brief.

The point herein under discussion was not originally made by appellants. It seems

to me from the above quotation, that appellants disclaimed any intention of relying upon it in their petition for rehearing. If not, however, the fact that the reasoning is circuitous shows the fallacy in the argument, and I believe the correct conclusion is that it is untenable.

*Fifth.* As the case is presented to us, there is a presumption of validity of the decree of confirmation, and the burden is on appellants to overcome that presumption. I believe the foregoing discussion shows that none of the points raised are tenable; that therefore the Commission and the District Court had jurisdiction over the persons of the claimants and appellee, and over the subject-matter; and that therefore the decree is valid.

### (c) Effect of the Decree of Confirmation.

Having established the validity of the decree of confirmation, I next consider its effect. Under section 13 of the act creating the commission (9 Stat. 633), it is provided that "for all claims finally confirmed by the said commissioners, or by the said District or Supreme Court, a patent shall issue to the claimant" upon compliance with certain procedural conditions. With respect to claims finally rejected, and those not presented to the Commission within two years, it is provided that the lands so claimed shall be considered a part of the public domain.

In section 15 (9 Stat. 634) it is provided: " * * * That the final decrees rendered by the said commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

*First.* That a grant once finally confirmed, as here, was to be protected against such forays as the one here presented, seems to have been definitely settled.

In Beard v. Federy, 3 Wall.(70 U.S.) 478, 492, 18 L.Ed. 88, involving the validity of a Mexican grant in California, it is said: "If parties asserting interests in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation, and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent would fail

to be, as it was intended it should be, an instrument of quiet and security to its possessor. The patentee would find his title recognized in one suit and rejected in another, and if his title were maintained, he would find his land located in as many different places as the varying prejudices, interests, or notions of justice of witnesses and jurymen might suggest. Every fact upon which the decree and patent rest would be open to contestation. The intruder, resting solely upon his possession, might insist that the original claim was invalid, or was not properly located, and, therefore, he could not be disturbed by the patentee. No construction which will lead to such results can be given to the fifteenth section."

In Thompson v. Los Angeles F. & M. Co., 180 U.S. 72, 76, 21 S.Ct. 289, 291, 45 L.Ed. 432, it is said:

"The ultimate basis of the contention is that the court of private land claims had no jurisdiction to confirm the grant because the governor of the Californias had no power to convey the public land for a money consideration. That is to say, the grant being void it could not be the basis of a claim to lands 'by virtue of any right or title derived from the Spanish or Mexican government.' * * *

"We think that counsel put too limited a signification on the words of section 8, that the claim shall be 'by virtue of any right or title derived from the Spanish or Mexican government.' The words, of course, were descriptive of the class of claims of which the board of land commissioners was given jurisdiction. They made a special tribunal of the board, limited to hear a particular class of claims, but not limited to the questions of law and fact which could arise in passing on and determining the validity of any claim of the class. The power to consider whatever was necessary to the validity of the claim—propositions of law or propositions of fact, the fact of a grant, or the power to grant—was conferred. If there should be a wrong decision the remedy was not by a collateral attack on the judgment rendered. The statute provided the remedy. * * * The jurisdiction of the board was necessarily commensurate with the purposes of its creation, and it was a jurisdiction to decide rightly or wrongly. If wrongly, a corrective was afforded, as we have said, by an appeal by the claimant or by the United States to the district court."

54

These quotations seem to be decisive of the instant case. It is urged that there are two reasons why the rules therein stated are not applicable. Those will be considered next.

*Second.* Appellants for the first time have, on rehearing urged a new point, which the majority, in its amended opinion, has held to be well founded. I quote from appellants' brief on rehearing: " * * * appellants assert that, whatever the form, the fact of the matter is that the United States did not represent the State, for the reason that the interests of the United States were hostile and adverse to those of the State, and one who has an adverse interest cannot represent those to whose interest his own are hostile. The fact cannot be gainsaid that upon purchasing the interests of Bissell, Aspinwall and McArthur the United States was the only real party in interest on *both* sides of the proceedings * * * " Under those facts it is said that the applicable law is that a decree given in a proceeding in which the real party in interest on both sides is the same, is "not binding upon any one other than the actual parties to the proceeding."

Assuming, without holding, that the rule as stated by appellants is correct, as applied to courts deriving their power from the Constitution, I explore the contention further to demonstrate its unsoundness.

The treaty of Guadalupe Hidalgo provided that "grantees may cause their legitimate [titles] to be acknowledged before the *American tribunals.*" (Italics supplied.)

The following quotation from United States v. Ferreira, 13 How. (54 U.S.) 40, 45, 46, 14 L.Ed. 42, respecting a somewhat similar treaty provision, is applicable: "The treaty certainly created no tribunal by which these damages were to be adjusted, and gives no authority to any court of justice to inquire into or adjust the amount which the United States were to pay to the respective parties who had suffered damage from the causes mentioned in the treaty. It rested with Congress to provide one, according to the treaty stipulation. But when that tribunal was appointed it derived its whole authority from the law creating it, and not from the treaty; and Congress had the right to regulate its proceedings and limit its power; and to subject its decisions to the control of an appellate tribunal, if it deemed it advisable to do so."

In accordance with that principle the nature of the obligation under the present treaty is shown by the following from Beard v. Federy, 3 Wall. (70 U.S.) 478, 492, 18 L.Ed. 88: "The obligation, to which the United States thus succeeded, was of course political in its character, and to be discharged in such manner and on such terms as they might judge expedient. By the Act of March 3d, 1851, they have declared the manner and the terms on which they will discharge this obligation." And more specifically, it is stated in Grisar v. McDowell, 6 Wall. (73 U.S.) 363, 379, 18 L.Ed. 863: "In the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may adopt such modes of procedure as it may deem expedient. It may act by legislation directly upon the claims preferred, or it may provide a special board for their determination, or it may require their submission to the ordinary tribunals. It is the sole judge of the propriety of the mode, and having the plenary power of confirmation it may annex any conditions to the confirmation of a claim resting upon an imperfect right, which it may choose. It may declare the action of the special board final; it may make it subject to appeal; it may require the appeal to go through one or more courts, and it may arrest the action of board or courts at any stage."

This quotation was approved in Trenouth v. San Francisco, 100 U.S. 251, 255, 25 L.Ed. 626. See, also, Astiazaran v. Santa Rita Mining Co., 148 U.S. 80, 81, 13 S.Ct. 457, 37 L.Ed. 376. It was held in Grisar v. McDowell, supra, where a claim was confirmed by the circuit court on appeal from a decree of confirmation made by the commission, and Congress thereafter confirmed the claim and modified the decree of the circuit court while appeal to the Supreme Court was pending, that the action of Congress was conclusive, and that the Supreme Court had no power to and could not affect the grant by its decision.

From these authorities I believe it is apparent that the discharge of the duties placed on the United States by the treaty was, in the first instance, to be carried out by Congress. Congress performed the duties by establishing the land commission, and providing that when that tribunal made a decision with respect to a particular claim, the decree so made "shall be conclusive between the United States and said claimants." And as subsequently held by the

Supreme Court, if the decree was conclusive upon those parties, it was equally conclusive on those who claimed under such parties. Congress has specified the condition, as it had the power to do, and we must give effect to that condition as it is written, without restricting or enlarging it. Reading into the provision quoted the effect of the decision of the majority we would then have the act read in effect: "The decree shall be conclusive between the United States and said claimants, excepting when made in proceedings where one party is the real party in interest on both sides."

I am content to let Congress pass the legislation, and believe there is no authority in this court to usurp that function. Congress itself confirmed grants in New Mexico under the same treaty. Act June 21, 1860, ch. 167, 12 Stat. 71. I am doubtful if even appellants would contend that such action of Congress could be held to be not binding on the ground of the exception herein proposed. Tameling v. United States Freehold, etc., Co., 93 U.S. 644, 662, 23 L.Ed. 998; Astiazaran v. Santa Rita Mining Co., supra. It is difficult to see how a decree of the commission, acting on behalf of and pursuant to authority conferred by Congress, can be held not binding on the same ground, since Congress did not so provide in the act.

With respect to the grants in California, Congress delegated its duty to a special commission. Although that commission is more in the nature of a congressional committee, some of the cases speak of it as exercising judicial functions. Statements in Astiazaran v. Santa Rita Mining Co., supra, imply that the commission was a court. Concede that fact, and it is still apparent that the authority of the court was only that given to it by the act of its creation; that it could confirm or reject grants only in the manner prescribed by the acts; that it did not function as a court with plenary powers, and was not intended as such. I believe that the foregoing conclusively shows that the confirmation by the commissioners was, except as to "third persons," to have the same effect with respect to attack such as this, as a confirmation by Congress, which, as the Supreme Court said in Tameling v. United States Freehold, etc., Co., supra, 93 U.S. 644, 662, 23 L.Ed. 998, was "conclusive, and therefore not subject to review in this or any other forum."

*Third.* It was originally contended by appellants, that appellants were "third per-

sons" within the meaning of section 15 of the act. The majority so held, but did not consider the complete statute.

Section 15 (9 Stat. 634) provides that "the final decrees rendered * * * shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons." It is quite clear from the statute that neither the United States nor the claimants can be "third persons." And it likewise means that all persons claiming under either the United States or the claimants are concluded, for in Beard v. Federy, supra, 3 Wall. 478, 492, 18 L.Ed. 88, speaking of the patent which follows the decree of confirmation it was said: "As against the government this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent." See, also, More v. Steinbach, supra, 127 U.S. 70, 83, 8 S.Ct. 1067, 32 L.Ed. 51. In fact, that is merely the general principle prevailing in all suits to quiet title, that the decree concludes the parties and their privies. See Dowell v. Applegate, supra, and Litchfield v. Goodnow's Adm'r, supra. When the statement quoted from Beard v. Federy, supra, is read in connection with the statement appearing in the same paragraph, it is apparent that the only persons who could "hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property" are those who claim under some title not descending from either the United States or the claimants. Here appellants claim under the United States and are concluded by the decree.

On rehearing, appellants concede that such contention is unsound law, saying: "Nor is it our contention that, in the ordinary sense, the State of California and its successors in interest are 'third parties' within the meaning of section 15 of the Land Commission Act. Were that question still open, we think it could be demonstrated that the State of California and these appellants were intended by Congress to be regarded as 'third persons' whose interests should not be affected by proceedings in confirmation * * * But we concede that it has been decided otherwise by the Supreme Court in regard to this particular statute. * * *"

Notwithstanding this concession, the majority on rehearing reiterates its holding, though on other grounds. In Lord v.

Veazie, 8 How. (49 U.S.) 251, 252, 12 L. Ed. 1067, an action was brought on a covenant in "a written instrument, which purported to be a conveyance by Veazie to Lord of 250 shares of the stock of" a railroad company. The railroad company, chartered by the State of Maine, had executed a deed to a bank, "by virtue of which that bank claimed to hold the entire property of the" railroad company. Veazie by the written instrument covenanted that the property of the corporation was free and clear of encumbrances, and that the stockholders thereof had a right to use certain river waters, which, it was shown, was granted by the State of Maine to Moor and others. In the Supreme Court, Moor for himself and as counsel for the bank, moved "to dismiss the appeal, upon the ground that it was a fictitious case, got up between said parties for the purpose of settling legal questions upon which he * * * [and the bank] had a large amount of property depending." The motion to dismiss was sustained, the court saying, 8 How. 251, at page 255, 12 L.Ed. 1067: "The objection in the case before us is, not that the proceedings were amicable, but that there is no real conflict of interest between them; that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be."

Based on this case, the majority say that "it would require an unequivocal decision of the Supreme Court to establish that California was not intended by Congress to be included in the phrase 'interests of third persons' used in the Land Board Act of 1851." It is sufficient to point out that the case relied on did not construe the phrase in the act mentioned, because that case dealt with an ordinary action at law, and was decided two years before the act in question was enacted. In Beard v. Federy, supra, and More v. Steinbach, supra, the phrase was construed as used in the act in question. The construction so given is opposite to the one used by the majority, and is controlling.

### (d) Time When Confirmation Takes Effect.

In More v. Steinbach, 127 U.S. 70, 83, 8 S.Ct. 1067, 1072, 32 L.Ed. 51, it is said: "The confirmation takes effect, by relation, as of the date of the first proceeding commenced before the land commissioners; and an adjudication that at that date it was valid, is also an adjudication that it was valid at the date it was made."

As applied to the instant case, the Castro grant was made in 1841, and therefore the land covered thereby was not ceded to the United States as public land by the Treaty of Guadalupe Hidalgo. It follows that instead of the State of California receiving an equitable title under the Swamp Act of 1850, it, in my opinion, received nothing, which is the title appellants now have.

### III. The Evidence.

### (a) Copy of Grant From Deed Records.

Appellee introduced into evidence a certified copy of the grant as recorded in the deed records of Sonoma county, Cal. The majority held such copy inadmissible because under California law "a certified copy of a document which is recorded in a county other than that where the land lies is not admissible."

In addition appellee introduced the record of the proceedings before the Commission in the Bissell case, as filed in the District Court. A copy of the grant was included in that record. Inasmuch as I believe the latter copy was admissible, it is unnecessary to discuss the holding of the deed record copy.

### (b) Admissibility of the Bissell Record.

The majority holds that the entire record in the Bissell case is inadmissible in the instant case, for the same reason it holds the decree not binding on appellants. I have heretofore discussed those reasons, and I believe shown them to be untenable, and therefore such record is admissible.

### (c) Copy of Grant from the Bissell Record

Appellee opened its case with testimony of the loss of papers and records.

Witness Iva Frances Bailey testified on behalf of appellee, as follows: "I am an employee in the office of the United States Surveyor General for California and have been there for thirty-seven years. Prior to the San Francisco earthquake and fire in 1906, there was in the possession and in the custody of that office the records and archives of the Mexican Government of California, also the records of land claims under Spanish grants presented to the Land Commission in California. I understand that all original papers connected

with the grant were also on file in the office. The effect of the fire of 1906 was a total destruction of all of these papers with the exception of a few that were in the safe."

Witness Frank E. Barker testified on behalf of appellee, as follows: "I am the office cadastral engineer in the Office of the Public Survey, which was formerly the United States Surveyor General for California. I have been there since 1909. I have had occasion to make a search through the archives of the Mexican Government prior to the acquisition of California by the United States and have found some of them. The proceedings before the Land Commission in the case of the confirmation of Mare Island I have been unable to find. There appears to be an incomplete expediente on the original documents that were submitted as exhibits to the Land Commission at the time of the application for confirmation. I do not find the original document of the grant from Juan B. Alvarado to Castro, * * *"

The majority stated, in its opinion, with respect to the Castro grant: "No original document was offered by the government or its absence explained. There is absence of search or proof of loss."

Ordinarily the original grant would have been in the possession of the Land Commission after the hearing. To show that the original grant was presented to the commission, I quote from its opinion confirming the grant: "The claimants in this case ask confirmation of their title which they derive from Victor Castro, by virtue of a grant issued to the said Castro, on the 20th day of May, 1841, by Governor Juan B. Alvarado, and have offered in evidence in support of their claim the *original grant* to the said Castro * * *" (Italics supplied.) There are also numerous other references in the record of the proceedings before the Land Commission showing that the original grant was "filed" with it.

Upon completion of its work, the Land Commission deposited its records in the office of the Surveyor General. The Act of May 18, 1858, ch. 39, § 1 (11 Stat. 289), made it the duty of the Secretary of the Interior to cause to be collected and deposited in the same office, "all official books, papers, instruments of writing, documents, archives * * * that may be found in the unauthorized possession of any individual." By the same act the Surveyor General was required to safely keep such documents. The presumption is that the officers performed their duties. In the absence of proof to the contrary, we must presume that the original grant was in possession of the Surveyor General of California.

This is sufficient to show that if we consider the record of the proceedings before the Land Commission, filed with the District Court, the original grant was in fact filed with the Commission. On the other hand, if we do not so consider such record, then we must presume that it was in the hands of the Surveyor General, so that under either theory the Surveyor General did in fact have the original grant. The evidence quoted shows the loss or destruction thereof. In view of what has been said, there seems to be justification for the suggestion that the statements quoted from the original majority opinion were improvidently made.

As amended on rehearing, the majority holds that the copy of the grant in the Bissell record is inadmissible because: (1) "all the authorities are agreed that a thorough search for the original must be made" in order for a copy of an *ancient* document to be admissible, and "no such search was proved to have been made by the government in this case"; and (2) it does not appear from the record of the Bissell case "that there was any deposit or recordation in the public archives of the Republic of Mexico of the claimed grant to Castro."

With respect to the majority holding that the copy of the grant in the Bissell record is inadmissible because there was no proof of a thorough search for the original, the testimony quoted, I believe, shows the contrary.

With respect to the second holding that there must be proof of recordation of the grant in the Mexican archives, I believe the majority has confused this suit with a proceeding before the Land Commission. In the latter, such recordation should be shown. But after action by the Commission on the claim presented, and its final affirmance, the parties cannot thereafter in a separate suit require proof of such facts. If such proof were required it would be contrary to Beard v. Federy, supra, and Thompson v. Los Angeles F. & M. Co., supra. It is there shown that if a patent is issued pursuant to a decree confirming a grant, it is that "record" which

is conclusive, or in other words, parties rely on their patents. Here, of course, there was no necessity for appellee to issue a patent to itself. Under such circumstances, I doubt that the original grant, or a copy thereof, need be shown in a separate suit, such as this. No reason appears why the decree itself should not be sufficient.

## IV. Property Covered by the Grant.

The Castro grant conveyed the "island in all its extent." The question arises as to whether this description is sufficient to cover the land in question.

It has been mentioned that the Sloat Board commenced negotiations for the purchase of the island on July 23, 1852. The next day, in reply to the letter from the Sloat Board, Bissell answered that he would sell his interest in the island at "$250 Two hundred & fifty dollars per acre, for that portion of the 'Island' lying *south* of the *main body* of the tule or low ground and $50 Fifty dollars per acre for that portion lying *north* of the *high* or *dry land,* the first supposed to contain about nine hundred acres and the last about thirteen hundred acres." On July 7, 1852, Bissell offered to sell "the whole Island" for $160,-000. The contract entered into between the owners and the government dated December 10, 1852, described the property to be conveyed as: " * * * Mare Island * * * including all the tule or low land and marsh belonging to the same, or which has ever been reputed or claimed to belong to the same * * * and all privileges, rights or claims to the waters, harbors, and creeks supposed or claimed to belong to the same tract known as Mare Island."

On December 13, 1852, the Secretary of the Navy wrote the Sloat Board asking their estimate of the value of Mare Island "with all its appendages." On the same date, this board advised the Secretary the amount of their estimate, stating that "the Island including the tule opposite Vallejo contains about nine hundred acres in addition to a large tract of tule," which description included the land in controversy.

The actual deed, dated January 4, 1853, described the property as: "Mare Island in the Bay of San Pablo, as recently surveyed by the board of officers of the United States sent to California for the selection of a site for the Navy Yard there, including all the Tule or low land and Marsh belonging to the same or which has ever been reputed or claimed to belong to the same. * * *"

On February 9, 1853, the Secretary of Navy wrote the President, stating that he was contemplating the selection of Mare Island as the site of the Navy Yard and Naval Depot in pursuance of the Act of August 31, 1852, c. 109, § 3 (10 Stat. 100, 104); that "negotiations have been in progress for the purchase of this island and its appendages for some time past"; that there was some doubt as to whether or not the United States did not at that time own title to the land, and therefore requested the reservation of "Mare Island, together with all its appendages of Tule or Marsh land ordinarily reputed to belong to said island. * * *"

On February 11, 1853, the President made the reservations recommended, and the following day the Secretary of Navy advised the Secretary of the Interior of the reservation, describing the land in the identical language quoted. This last letter was answered by the Commissioner of the General Land Office, on February 16, 1853, advising that the order of reservation had been duly recorded in his office.

The opinion of the Attorney General, of April 9, 1853, said: "I am satisfied that the State of California may set up, and probably maintain, title, as against the United States, to so much of Mare Island as is subject to overflow by water, whether periodically or otherwise, that is, at least, to all below high water mark."

The decree of confirmation by the commission on May 8, 1855, confirmed the grant to Mare Island, describing it as "an Island is bounded by the water's edge." The unsigned decree of the District Court, March 2, 1857, confirmed the grant to Mare Island "with its natural boundaries."

The land in controversy was shown as a part of Mare Island in the Dyer Survey, approved by the United States Surveyor General of California on September 17, 1863.

On September 17, 1873, the chief of the Bureau of Yards and Docks, Navy Department, acting under authority of the Secretary of Navy, appointed a board of civil engineers to present a plan for the development of the Navy Yard at Mare Island.

The commandant of the Navy Yard, Mare Island, wrote the Chief of the Bureau on September 26, 1873, that "Mare

Island" included the land here in controversy.

The board thus appointed, on September 17, 1873, made its report on November 19, 1873, from which we quote:

"The extreme length of this island, including a large tract of tule on the northern side, and extending toward Napa and Sonoma, is about ten miles, and its average width, including tule, about three-quarters of a mile.

"The area of upland is 741 acres, and of the tulelands on the east side, which will be available for yard purposes, is 135 acres.

"No accurate measurement has been made of the area of the tule on the northern side, but an approximate area is 3,973 acres. * * *

"Soon after our arrival the commandant of the yard * * * informed us that a question had been raised as to the validity of the title held by the United States to the tract of tule on the northerly side of the island. * * *"

The commandant of the Mare Island Navy Yard advised the Register at Sacramento, Cal., on November 24, 1873 that the United States claimed the land here in question, and likewise advised the Board of Supervisors of Solano county, Cal., by letter dated the following day.

The United States Surveyor General instructed one Freeman to make a survey of Mare Island (in accordance with the Act of July 1, 1864, c. 194, 13 Stat. 332) on July 19, 1877. Freeman made his survey thereafter, showing the land in question, and the area of Mare Island as 5,337.22 acres. Notice that the survey had been made was published in accordance with the act. On July 5, 1879, an attorney for the then alleged owners of the land in controversy protested against the Freeman Survey to the Surveyor General, and on July 16, 1879, protested likewise to the commissioner of the Land Office. On August 7, 1879, the Surveyor General forwarded the survey to the commissioner, saying that the survey should be limited to the lands lying south of those in controversy, and: "I consider the survey incorrect in that it not only includes tracts which are properly islands in themselves but also embraces a large quantity of tide lands. * * *"

It does not appear that the Freeman Survey was approved by the Commissioner as provided in the act. Evidence was also introduced to show that one E. H. Sawyer

(referring to Sawyer v. Osterhaus, supra), was, at the time the letter of the Surveyor General was written, the corresponding clerk who wrote the letter.

On December 22, 1883, the chief of the Bureau of Yards and Docks advised the Secretary of Navy that "Mare Island" included the "tule" or "swamp" land in dispute.

In a corrected report of Spanish and Mexican grants in California complete to February 25, 1886, prepared by the State Surveyor General, "G. W. P. Bissell et al." are shown as "confirmee" of Mare Island, the area of which is shown to be 5,527.22 acres.

In San Francisco Sav. Union v. Irwin, decided July 8, 1886, supra, it is indicated that the land in question was not covered by the grant.

In Sawyer v. Osterhaus, supra, decided February 7, 1914, it is said that the land in controversy "is physically a part of the body of land officially known and designated as 'Mare Island.'"

The Commissioner of the General Land Office wrote the Register and Receiver at San Francisco, on September 16, 1914, regarding certification to the State of California of certain swamp lands on Mare Island, saying that: "As the whole of the island was granted to Castro, such a description would include the lowland or the tule and marsh, as well as the high or uplands."

United States Surveyor Lightfoot, acting under instructions of the Surveyor General dated January 6, 1915, made his report of examination and investigation of alleged "Swamp and Overflowed" land and extent of Mare Island, that the land in question was a part of Mare Island.

Francis E. Joy, United States Cadastral Engineer, acting under instructions of United States Surveyor General dated January 27, 1921, made his report on "Lands Properly Belonging To Mare Island," on October 23, 1922. His opinion seemed to be that the lands in question were tidelands, and his plat sent with the report was not accepted, and was ordered revised. The revised plat was accepted on November 8, 1923, and shows the land in question as a part of Mare Island.

One of the appellants herein brought suit in the District of Columbia against the Secretary of the Interior, in which suit, on May 27, 1924, a peremptory writ of man-

damus was issued directing the Secretary to decide whether the land here in question was or was not "swamp land" on September 28, 1850. On January 10, 1925, the Secretary decided that such lands were swamp in character, and "that it was above ordinary high-water mark and formed a contiguous body attached to the higher portion of Mare Island."

On February 12, 1925, the Secretary of the Navy wrote the Secretary of the Interior concerning this land, and, after outlining certain facts, said: "From the foregoing it seems clear that the grant to Victor Castro of Mare Island 'in the entire extent' included all of the tule lands which physically formed an integral part thereof. If it had been intended to eliminate the tule lands from this grant such sweeping language would not have been used. The words 'in the entire extent' clearly indicate that it was intended to grant all lands which in any way were connected with and formed part of Mare Island."

Many maps were introduced in evidence. Nineteen of these maps were dated in 1850 or prior, the earliest being dated 1775, being a Spanish map by Ayala. Four of the maps were dated in 1850. Of these three were made by Ringgold of the United States Navy, and the other was a United States Coast Survey map. From this evidence it is quite possible to infer that Mare Island included the land in question. Approximately thirty maps dated from 1851 to 1931 were also introduced. In all but two or three of these maps Mare Island is depicted as including the land in controversy.

There was also introduced in evidence a plat showing cross-sections of the land in controversy. The line of the mean high tide is shown and the line of the surface of the land is depicted by using notes of surveys made in 1850 to 1852. The plat is some evidence that the land in controversy was, in 1850, higher than the line of mean high tide.

Some of the foregoing evidence is inadmissible, and with respect thereto consideration has been given to it herein for historic purposes only, some of it of only slight probative effect, but, considering the difficulty now of proving the extent of the island at the time of the confirmation, I believe that the admissible evidence before us shows that the land in controversy was at such time above the line of mean high tide, as the trial court held.

In United States v. Pacheco, 2 Wall. (69 U.S.) 587, 590, 17 L.Ed. 865, it is said: "By the common law, the shore of the sea, and, of course, of arms of the sea, is the land between ordinary high and low-water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails."

The decree of confirmation, stating the boundary as "the water's edge," would therefore mean the line of mean high tide, and such a description would include the land in question.

## V. Other Questions.

Appellee contends, also, that from the time of the cession until the grant was finally confirmed or rejected, the lands ceded were reserved, and therefore could not pass to the state under the Swamp Act.

In San Francisco v. Le Roy, 138 U.S. 656, 670, 11 S.Ct. 364, 368, 34 L.Ed. 1096, it was said that the Swamp Act "was never intended to apply to lands held by the United States charged with any equitable claims of others, which they were bound by treaty to protect." Appellee also contends that the evidence shows possession of the land in question by Castro, which is an equitable claim (without the necessity of considering the decree), and therefore the land could not pass to the state.

Discussion of these questions is unnecessary in view of the conclusion I have heretofore reached.

In retrospect it seems to me that appellants' concessions on rehearing have made it impossible to legally support a title in appellants. The decision of the District Court should be affirmed.

For the reasons above set forth, I dissent from the majority opinion as amended and from the order denying the petition for rehearing.